## THE TRUSTEES OF DARTMOUTH COLLEGE
### *versus*
### WILLIAM H. WOODWARD.

The corporation of *Dartmouth College* is a public corporation.

An act of the legislature, adding new members to such a corporation without the consent of the old corporation, is not repugnant to the constitution of this state.

The charter of the king creating the corporation of *Dartmouth College*, is not a contract within the meaning of that clause in the constitution of the *United States* which prohibits states from passing laws impairing the obligation of contracts.

THIS was an action of trover, for sundry articles alleged to be the property of the plaintiffs. The cause was submitted to the decision of the court upon a statement of facts; but as the facts are all stated in the opinion of the court, it is deemed unnecessary to detail them here. And it was agreed that, if either party should desire it, the statement of facts should be turned into a special verdict, in order that the case might be carried to the supreme court of the *United States* upon a writ of error.

The cause was argued in this county, at the last term of this court, by *Mason* and *Smith* for the plaintiffs, and by the attorney general for the defendant; and again at September term, in *Rockingham*, by *Mason*, *Smith* and *Webster*, for the plaintiffs, and by the attorney general and *Ichabod Bartlett*, for the defendant; and now at this term the opinion of the court was delivered by

RICHARDSON, C. J. This cause, which is trover for sundry articles alleged to be the property of the plaintiffs, comes before the court upon a statement of facts, in which it is agreed by the parties that the trustees of *Dartmouth College* were a body corporate, duly organized under a charter bearing date December 13, 1769; that the several articles mentioned in the writ were the property of that body corporate, and that before the commencement of this action the said articles being in the possession of the defendant, he refused, although duly requested, to deliver them to the plaintiffs. Upon these facts it is clear that judgment must be rendered for the plaintiffs, unless the facts upon which the defendant relies constitute a legal defence.

Dart. College
*vs.*
Woodward.

By an act of this state, passed June 27, 1816, entitled " An act to amend the charter and enlarge and improve the " corporation of *Dartmouth College*," it is, among other things, enacted, " that the corporation heretofore called and " known by the name of the *Trustees of Dartmouth College*, shall ever hereafter be called and known by the " name of the *Trustees of Dartmouth University*, and the " whole number of said trustees shall be twenty-one, a ma-" jority of whom shall form a quorum for the transaction of " business; and they and their successors, in that capacity, " as hereby constituted, shall respectively forever have, " hold, use, exercise and enjoy all the powers, authorities, " rights, property, liberties, privileges and immunities which " have hitherto been possessed, enjoyed and used by the " trustees of *Dartmouth College*." " And the governor " and council shall by appointment as soon as may be, com-" plete the present board of trustees to the number of twen-" ty-one, as provided for by this act, and shall have power " also to fill all vacancies that may occur previous to, or " during the first meeting of said board of trustees." By an act of this state passed December 18, 1816, entitled "An " act in addition to and in amendment of an act entitled an " act to amend the charter," &c., it is declared, " that the " governor, with advice of council, is authorized to fill all " vacancies that have happened, or may happen in the board " of said trustees previous to their next annual meeting."

It is agreed by the parties, that in pursuance of the pro-visions of these acts, the governor and council " completed " the said board of trustees to the number of twenty-one," by appointing nine new trustees, who accepted the trust; and that previous to the commencement of this action, at a meeting of the trustees of *Dartmouth University*, held as the law requires, and composed of two of the former trustees of *Dartmouth College*, and the nine new trustees appointed as aforesaid, being a sufficient number to constitute a quo-rum of the whole board of twenty-one, the defendant was

duly appointed treasurer and secretary of the trustees of *Dartmouth University*; and the articles mentioned in the plaintiffs' writ duly committed to his custody, as the property of the *University*.

Dart. College<br>*vs.*<br>Woodward.

It is also agreed, that nine of the old trustees of *Dartmouth College* have individually, and, as far as by law they could, as a corporation, refused to accept the provisions of the acts of June 27 and December 18, 1816, and still claim to be a corporation, as constituted by the charter of 1769, and to have the same control over the property which belonged to the *College* as they had before those acts were passed. And this action is brought to enforce that claim. If those parts of the acts above mentioned, which authorize the appointment of new trustees, are valid and binding upon the trustees of *Dartmouth College* without their consent, this action cannot be maintained : because in that case the corporation must now be considered as composed of twenty-one members, and any claim of a minority of the corporation to control the affairs of the institution in opposition to the majority, is clearly without any legal foundation. But if, on the other hand, those acts are to be considered in that respect as unconstitutional and void, then the appointment and all the doings of the new trustees are invalid ; the corporation remains as constituted by the charter of 1769, and the plaintiffs must prevail in this action. The decision of the cause must, therefore, depend upon the question, Whether the legislature had a constitutional right to authorize the appointment of new trustees, without the consent of the corporation ?

This cause has been argued on both sides with uncommon learning and ability, and we have witnessed with pleasure and with pride a display of talents and eloquence upon this occasion in the highest degree honorable to the profession of the law in this state. If the counsel of the plaintiffs have failed to convince us that the action can be maintained, it has not been owing to any want of diligence in research, or

Dart. College ingenuity in reasoning, but to a want of solid and substantial
*vs.*
Woodward. grounds on which to rest their arguments.

A complaint that private rights, protected by the constitu-
tion, have been invaded, will at all times deserve and receive
the most deliberate consideration of this court.   The cause
of an individual whose rights have been infringed by the
legislature, in violation of the constitution, becomes at once
the cause of all.   For if a private right be thus infringed
to-day, and that infringement be sanctioned by a judicial
decision to-morrow, there will be next day a precedent for
the violation of the rights of every man in the community;
and so long as that precedent is followed, the constitution
will be in fact to a certain extent repealed.   An unconstitu-
tional act must always be presumed to have been passed in-
advertently, or through misapprehension; and it is equally
to be presumed that every honest legislature will rejoice
when such an act is declared void and the supremacy of the
constitution maintained.   But we must not for a moment
forget, that the question submitted to our decision in such
cases is always one of mere constitutional right.   Sitting
here as judges, we have nothing to do with the policy or
expediency of the acts of the legislature.   The legislative
power of this state extends to every proper object of legisla-
tion, and is limited only by our constitutions, and by the fun-
damental principles of all government and the unalienable
rights of mankind.   In giving a construction, however, to a
doubtful clause in the constitution, we might with propriety
weigh the conveniences and inconveniences which would re-
sult from a particular construction; because in such a case
arguments drawn from those sources might have a tendency
to shew the probable intention of the makers of the consti-
tution.   But when the constitutional right to pass a law is
clear, the question of expediency belongs exclusively to the
legislature.   Nor is an act in any case to be presumed to be
contrary to the constitution.   The opposition between that
instrument and the act should be such as to produce upon
our minds a clear and strong conviction of their incompati-

bility with each other, before we pronounce the act void. A <span style="float:right">Dart. College<br>vs.<br>Woodward.</span> decent respect for the other branches of the government ought to induce us to weigh well the reasons upon which we found our opinions upon questions of this kind, and not to refuse to execute a law till we are able to vindicate our judgment by sound and unanswerable arguments. For if we refuse to execute an act warranted by the constitution, our decision in effect alters that instrument, and imposes new restraints upon the legislative power, which the people never intended. On the other hand, if clearly convinced that an act of the legislature is unconstitutional, we should be unworthy of the station in which we are placed if we shrunk from the duties which that station imposes.

In order to determine the question submitted to us, it seems necessary, in the first place, to ascertain the nature of corporations.—A corporation aggregate is a collection of many individuals, united into one body under a special name, having perpetual succession under an artificial form, and vested by the policy of the law with the capacity of acting in several respects as an individual, and having collectively certain faculties which the individuals have not. A corporation, considered as a faculty, is an artificial, invisible body, existing only in contemplation of law : and can neither employ its franchises nor hold its property for its own benefit. In another view a corporation may be considered as a body of individuals having collectively particular faculties and capacities, which they can employ for their own benefit, or for the benefit of others, according to the purposes for which their particular faculties and capacities were bestowed. In either view it is apparent that all beneficial interests, both in the franchises and the property of corporations, must be considered as vested in natural persons, either in the people at large, or in individuals ; and that, with respect to this interest, corporations may be divided into *public* and *private*.

*Private* corporations are those which are created for the immediate benefit and advantage of individuals ; and their

franchises may be considered as privileges conferred on a number of individuals, to be exercised and enjoyed by them in the form of a corporation. These privileges may be given to the corporators for their own benefit, or for the benefit of other individuals. In either case the corporation must be viewed in relation to the franchises as a trustee, and each of those who are beneficially interested in them, as a *cestui que trust.* The property of this kind of corporations, and the profits arising from the employment of their property and the exercise of their franchises, in fact belongs to individuals. To this class belong all the companies incorporated in this state for the purpose of making canals, turnpike roads and bridges; also banking, insurance and manufacturing companies, and many others. Both the franchises and the property of these corporations exist collectively in all the individuals of whom they are composed; not, however, as natural persons, but as a body politic, while the beneficial interest in both is vested severally in the several members, according to their respective shares. This interest of each individual is a part of his property. It may be sold and transferred; may, in many cases, be seized and sold upon a *fieri facias,* and is assets in the hands of his administrator. This is by no means a new view of this subject. The supreme court of *Massachusetts,* in the case of *Gray* vs. *The Portland Bank,* 3 *Mass. Rep.* 379, most evidently viewed corporations of this kind in the same light. In the case of *The Bank of the United States* vs. *Devaux,* 5 *Cranch* 61, the supreme court of the United States decided, that in determining a question of jurisdiction depending upon the citizenship of the parties, and a corporation being a party, they could look to the citizenship of the individual corporators as of the real litigants. The rejection of a corporator as a witness, in cases where the corporation is a party, on the ground of private interest, is a matter of familiar practice in all our courts.

*Public* corporations are those which are created for public purposes, and whose property is devoted to the objects for

which they are created. The corporators have no private <span style="float:right">Dart. College<br>*vs.*<br>Woodward.</span> beneficial interest, either in their franchises or their property. The only private right which individuals can have in them, is the right of being, and of acting as members. Every other right and interest attached to them can only be enjoyed by individuals like the common privileges of free citizens, and the common interest which all have in the property belonging to the state. Counties, towns, parishes, &c., considered as corporations, clearly fall within this description. A corporation, all of whose franchises are exercised for public purposes, is a public corporation. Thus if the legislature should incorporate a number of individuals, for the purpose of making a canal, and should reserve all the profits arising from it to the state, though all the funds might be given to the corporation by individuals, it would in fact be a public corporation. So if the state should purchase all the shares in one of our banking companies, it would immediately become a public corporation. Because in both cases all the property and franchises of the corporations would in fact be public property. A gift to a corporation created for public purposes, is, in reality, a gift to the public. On the other hand, if the legislature should incorporate a banking company for the benefit of the corporators, and should give the corporation all the necessary funds, it would be a private corporation ; because a gift to such a corporation would be only a gift to the corporators. So should the state purchase a part of the shares in one of our banks, it would still remain a private corporation so far as individuals retained a private interest in it. Thus it seems that whether a corporation is to be considered as public or private, depends upon the objects for which its franchises are to be exercised ; and that as a corporation possesses franchises and property only to enable it to answer the purposes of its creation—a gift to a corporation is in truth a gift to those who are interested in those purposes.

Whether an incorporated college, founded and endowed by an individual, who had reserved to himself a control over

Dart. College
  vs.
Woodward. its affairs as a private visitor, must be viewed as a public or as a private corporation, it is not necessary now to decide, because it does not appear that *Dartmouth College* was subject to any private visitation whatever.

Upon looking unto the charter of *Dartmouth College* we find that the king, " being willing to encourage the laudable " and charitable design of spreading christian knowledge " among the savages of our *American* wilderness, and also " that the best means of education be established in the " province of *New-Hampshire*, for the benefit of said prov- " ince," ordained that there should be a *College* created in said province, by the name of *Dartmouth College*, " for the " education and instruction of youth of the Indian tribes, " in this land, in reading, writing, and all parts of learning " which should appear necessary and expedient for civilizing " and christianizing children of pagans, as well as in all " liberal arts and sciences, and also of *English* youth and " any others ;" and that there should be in the said *Dartmouth College*, from henceforth and forever, a body politic, consisting of trustees of *Dartmouth College*.    He then " made, ordained, constituted and appointed" twelve individuals to be trustees of the *College*, and declared that they and their successors should forever thereafter be a body corporate, by the name of the *Trustees of Dartmouth College ;* and that said corporation should be " able, and in law capa- " ble, for the use of said *College*, to have, get, acquire, pur- " chase, receive, hold, possess and enjoy tenements, heredita- " ments, jurisdictions and franchises, for themselves and " their successors, in fee simple or otherwise ;" and " to re- " ceive and dispose of any lands, goods, chattels and other " things, of what nature soever, for the use aforesaid ; and " also to have, accept and receive any rents, profits, annu- " ities, gifts, legacies, donations or bequests, of any kind " whatsoever, for the use aforesaid."    Such are the objects, and such the nature of this corporation, appearing upon the face of the charter.    It was created for the purpose of holding and managing property for the use of the *College ;* and

the *College* was founded for the purpose of " spreading the Dart. College "knowledge of the Great Redeemer" among the savages, *vs.* Woodward. and of furnishing " the best means of education" to the province of *New-Hampshire.* These great purposes are surely, if any thing can be, matters of public concern. Who has any private interest either in the objects or the property of this institution? The trustees themselves have no greater interest in the spreading of christian knowledge among the Indians, and in providing the best means of education, than any other individuals in the community. Nor have they any private interest in the property of this institution—nothing that can be sold or transferred; that can descend to their heirs, or can be assets in the hands of their administrators. If all the property of the institution were destroyed, the loss would be exclusively public, and no private loss to them. So entirely free are they from any private interest in this respect, that they are competent witnesses in causes where the corporation is a party, and the property of the corporation in contest. There is, in *Peake's Cases at Nisi Prius* 154, an authority direct to this point. It is the case of *Weller* against the governors of the *Foundling Hospital,* and was assumpsit for work and labor. Most of the witnesses called on behalf of the defendants were governors and members of the corporation. Lord *Kenyon* was of opinion that they were, nevertheless, good witnesses, because they were mere trustees of a public charity, and had not the least personal interest. The office of trustee of *Dartmouth College* is, in fact, a public trust, as much so as the office of governor, or of judge of this court; and for any breach of trust the state has an unquestionable right, through its courts of justice, to call them to an account. The trustees have the same interest in the corporate property which the governor has in the property of the state, and which we have in the fines we impose upon the criminals convicted before this court. Nor is it any private concern of theirs, whether their powers, as corporators, shall be extended or lessened, any more than it is our private concern whether the jurisdiction

Dart. College *vs.* Woodward.

of this court shall be enlarged or diminished. They have no private right in the institution, except the right of office, the right of being trustees, and of acting as such. It therefore seems to us, that if such a corporation is not to be considered as a public corporation, it would be difficult to find one that could be so considered.

It becomes, then, unnecessary to decide in this case, how far the legislature possesses a constitutional right to interfere in the concerns of private corporations. It may not, however, be improper to remark, that it would be difficult to find a satisfactory reason why the property and immunities of such corporations should not stand, in this respect, on the same ground with the property and immunities of individuals.

In deciding a case like this, where the complaint is that corporate rights have been unconstitutionally infringed, it is the duty of the court to strip off the forms and fictions with which the policy of the law has clothed those rights, and look beyond that intangible creature of the law, the corporation, which *in form* possesses them, to the individuals and to the public, to whom in *reality* they belong, and who alone can be injured by a violation of them. This action, therefore, though *in form* the complaint of the corporation, must be considered as *in substance* the complaint of the trustees themselves.

The acts in question can only affect *public* or *private* rights and interests. With regard to the rights and interests which the public may have in the institution, no provision in the constitution of this state, nor of the *United States*, is recollected, which can protect them from legislative interference. We have been referred to no such provision, in the argument. The clauses in those constitutions, upon which the plaintiffs' counsel have relied, were most manifestly intended to protect private rights only. All public interests are proper objects of legislation; and it is peculiarly the province of the legislature to determine by

what laws those interests shall be regulated. Nor is the expediency or the policy of such laws a subject for judidicial decision. The constitution has given to the general court full power and authority to make and ordain all such laws "as they may judge for the benefit and welfare of this state." Should we assume the power of declaring statutes valid or invalid, according to our opinion of their expediency, it would not be endured for a moment, but would be justly viewed by all as a wanton usurpation, altogether repugnant to the principles of our government. Nor are these plaintiffs competent to call in question the validity of these laws in a court of justice, on the ground that they are injurious to the public interests. A law is only the public will duly expressed. These trustees are the servants of the public, and the servant is not to resist the will of his master, in a matter that concerns that master alone. If these acts be injurious to the public interests, the remedy is to be sought in their repeal, not in courts of law. But if these acts infringe *private* rights protected by the constitution, whether of the trustees themselves, or of others, whose rights they, from their situation, are competent to vindicate, then the plaintiffs have proper ground upon which to submit their validity to our decision.

All private rights in this institution must belong either to those who founded or whose bounty has endowed it; to the officers and students of the college, or to the trustees.

As to those who founded or who have endowed it, no person of this description, who claims any private right, has been pointed out or is known to us. It is not understood that any person claims to be a visitor of this college. An absolute donation of land or money to an institution of this kind, creates no private right in it. Besides, if the private rights of founders or donors have been infringed by these acts, it is their business to vindicate their own rights. It is no concern of these plaintiffs. When founders and donors complain, it will be our duty to hear and decide; but we cannot adjudicate upon their rights till they come judi-

cially before us. It has been strenuously urged to us, in the argument, that these acts will tend to discourage donations, and are therefore impolitic. Be it so. That was a consideration very proper to be weighed by those who made the acts, but is entitled to no weight in this decision.

The officers and students of the college have, without doubt, private rights in the institution—rights which courts of justice are bound to notice—rights which, if unjustly infringed, even by the trustees themselves, this court, upon a proper application, would feel itself bound to protect. But for any injury done to their rights they have their own remedy. It would be unjust to prejudge their case on this occasion. They are not parties to this record, and cannot be legally heard in the discussion of this cause. If no form of action given them by law can be conceived, it is because these acts do no injury to their rights.

The real question then is, do these acts unconstitutionally infringe any private rights of these trustees? It is said that these acts in fact attempt to dissolve the old corporation, to create a new one, and to transfer the property of the old corporation to the new, and are therefore void on the principle decided in *Territ & al.* vs. *Taylor,* 9 *Cranch* 43. But admitting this to be the attempt, we might with great propriety remark, in the language of *Ashurst, J.* in the case of *The King* vs. *Pasmore,* 3 *D. & E.* 244, that " the mem- " bers of the old body have no injury or injustice to com- " plain of, for they are all included in the new charter of in- " corporation ; and if any of them do not become members " of the new incorporation, but refuse to accept, it is their own fault." But it seems to us impossible to suppose that the legislature intended by these acts to dissolve the old corporation or to create a new one, nor do we conceive that the addition of new members can in any case be consider- ed as a dissolution of a corporation. The legislature of this state have not unfrequently annexed tracts of inhabited ter- ritory to towns, and thereby added new members to the cor- poration. Yet who ever supposed that this was a dissolu-

tion of the old, and the creation of a new corporation? Our statute of December 11, 1812, *N. H. Laws* 184, makes the shares and interest of any person in any incorporated company liable to be seized and sold upon execution, and gives to the purchaser all the privileges appertaining thereto, and of course makes him a member of the corporation. But the thought probably never occurred to any man, that when a new member is added, by virtue of that act, the corporation is thereby dissolved and a new one created. Yet that act has at least as much dissolving and as much creating force as the acts now under consideration.

The plaintiffs, in taking this ground, seemed not to have adverted to a material distinction, which certainly exists between the rights and faculties relating to corporations, which can exist only in the corporators, as natural persons, and the corporate rights and faculties, which can exist only in the corporation. The right to the beneficial interest in the corporate property can only exist in natural persons. But the legal title and ownership in corporate property can in no case be considered as vested in the several corporators, as natural persons, either jointly or severally, but collectively in all, as one body politic, made capable by the policy of the law of holding property as an individual. This artificial individual, which is said to be immortal, holds in all cases the legal title. Hence a corporation may maintain trespass against any of its members who intermeddle with its property without its consent. Hence, too, the legal title of a corporation in lands will not pass by the deed of all its members. This faculty of holding property as an individual, which the policy of the law vests in a body of natural persons, that can be perpetuated by known rules of law, is one of the great ends and uses of an incorporation. But the natural persons who compose this artificial, immortal individual, in which the property is vested, must, in the nature of things, be continually fluctuating and changing; and yet the artificial individual remains, in contemplation of law, the same. It is, therefore, clear, that the legal identity

of a corporation does not depend upon its being composed of the same natural persons, and that an addition of new members to a corporation cannot in itself make it a new and different corporation. The immortality of a corporation depends upon a continued accession of new members. The mode in which this accession is effected is immaterial. A few of our corporations are perpetuated by a power of electing new members, placed in the corporations themselves. But most of our public, and all of our private corporations, are perpetuated by mere operation of law, without any corporate act whatever. Nor, by the addition of new members, is any part of the legal title to the corporate property transferred from the old to the new members. The title remains unaltered in the corporation. The old members had not personally any such title that could be taken from them; and the new members have personally acquired none. The error of the plaintiffs on this subject probably originated in their supposing that the legal title to corporate property is vested in the corporators, in the same manner that the title to partnership property is vested in co-partners. Indeed, their counsel endeavored to illustrate this point by comparing corporate to partnership property. And if the comparison had been just, the inferences which the counsel made would also have been just. But the comparison does not hold, unless we are entirely mistaken as to the manner in which the legal title to corporate property is vested. The addition of new members by a legislative act, even to a private corporation, does not necessarily divest the old corporators of any private beneficial interest which they may individually have in the corporate property. Suppose the legislature should enact that the governor should be ex-efficio a member of all the banking corporations in the state. This might give him a personal influence in the management of their concerns, but would give him no beneficial interest whatever in the corporate property. The interest of the stockholders would remain the same. In the case of corporations, where all the benefit derived from

them consists in the privileges incident to membership, as in incorporated library companies, it may be otherwise. But in the property of public corporations there is no private beneficial interest that can be divested. We are, therefore, of opinion, that these acts, if valid, do not dissolve the old corporation nor create a new one; nor do they operate in such a manner as to change or transfer any legal title or beneficial interest in the corporate property, but the legal title remains in the corporation, and the beneficial interest in the public, unaffected.

It has also been contended, that it depends altogether upon contract whether the old trustees shall become members of the corporation as now organized; that there can be no contract without consent; and that, therefore, these acts cannot bind the old trustees without their consent, and must, in the nature of things, be invalid. The whole amount of this argument is this: a statute which attempts to compel the members of a corporation to become members of that corporation, differently organized, without their consent, is invalid; and as these acts make such an attempt, they are therefore invalid. To this there are two decisive answers. 1. Neither of the propositions upon which the conclusion rests is true. 2. Admitting the premises to be correct, the legitimate conclusion to be drawn from them is wholly irrelevant to the question in the case. In the first place, the proposition that it depends altogether upon contract whether individuals shall become members of particular corporations, is not universally true; and so far as respects public corporations, it is never true. The legislature has a most unquestionable right to compel individuals to become members of public corporations. Thus when a town is incorporated, all the inhabitants become members of the corporation, and continue members so long as they reside within its limits, whether they consent or not. Nor is there any good reason to doubt that the legislature possess the right to compel individuals to accept the office of trustees of Dartmouth College, however the corporation may

Dart. College
*vs.*
Woodward.

be organized, any more than there is to doubt the right of the legislature to compel individuals to serve as town officers, as is done by our statute of February 8, 1791, *Laws* 241, or to be enrolled in the militia, and hazard their lives in defence of the state. It is a fundamental principle of all governments, recognized in the twelfth article of our bill of rights, that a state has a right to the personal service of its citizens, whenever the public necessity requires it,—and the government has a right to judge of that necessity. There is a very strong case in 2 *Mod. Rep.* 299, *The Attorney General* vs. *Sir John Read.* It was an information against Read, for refusing to serve as high sheriff of Hertfordshire. His defence was, that, being under sentence of excommunication, he could not receive the sacrament, and that by serving as high sheriff without receiving it, he subjected himself to a penalty of five hundred pounds; but the court held that he was punishable for not removing the disability, it being in his power to get himself absolved from the excommunication; and gave judgment against him. Nor is the proposition that these acts attempt to compel the old trustees to become members of this corporation, as now organized, without their consent, true. They are left perfectly at liberty to continue members of the corporation or not, according to their own pleasure. It is enacted that the board shall hereafter consist of twenty-one members, but it is not enacted that they shall continue members of it against their consent. They had, before these acts were passed, a perfect right to resign when they pleased; and that right is not impaired by these acts.

But, in the second place, admitting the premises to be true, the legitimate conclusion does not bear upon the question in this case. The fair conclusion to be drawn from the premises is, that these acts, so far as they attempt to compel the old members to become members of the corporation as now organized, are invalid. But the question here is, not whether the legislature can compel the old trustees to become members of the newly organized corporation, but whether

it has a constitutional right to make a new organization of the corporation, by adding new members? And it is very apparent that although the legislature may not possess the power to do the one, yet still it may have a constitutional right to do the other. There is a clear distinction between laws binding corporate bodies, and laws attempting to bind individuals to continue members of corporate bodies. Thus the legislature has an undoubted right at all times to pass laws binding the whole body politic of the state; but it is by no means clear that the legislature has at all times a right to compel individuals to remain in the state, and be subject to those laws. So the legislature has a right to incorporate towns; but can it compel the inhabitants to remain in them, and continue members of such corporation?

But what is such a new organization of a corporation as cannot be made without the consent of the corporators? If new members cannot be added, can any new duty be imposed upon a corporation, or can the corporate powers and faculties be in any way limited, without such consent? Our statute of June 21, 1814, *Laws* 284, makes it the duty of the several incorporated banks to make a return of the state of their several banks to the governor and council annually, in June, under a penalty of one thousand dollars. If the doctrine of these plaintiffs be true, may not the stockholders say that they cannot be compelled to be members of corporations, subject to new and different duties, without their consent, and that therefore this act is void? And may not the same argument be used in regard to the acts of June 11, 1803, and June 17, 1807, which prohibit banks from issuing bills of a certain description? In fact, does not this doctrine amount to a denial of the right to legislate at all on the subject of corporations without their consent?

But, although an artificial individual, capable of holding the legal title to property, may be created by the policy of the law, and a kind of artificial will and judgment as to the management of its concerns, given to it by making the con-

Dart. College
vs.
Woodward.

sent of a number of natural persons necessary in all its acts; yet still this artificial will and judgment is, after all, only the private will and judgment of natural persons, in some respects limited and restricted.   In this point of view, a corporation may be considered as a body of natural persons, having power and authority vested in them to manage the corporate concerns in such a manner as a majority of a competent number of them may judge and determine to be best calculated to answer the ends of the incorporation.  And it has been truly said by the counsel of the plaintiffs, that by the charter of 1769 exclusive power and authority was given to the twelve trustees to manage the affairs of this corporation in such manner as a majority of any seven or more of them, duly convened for the purpose, might judge most expedient to answer the purposes of the institution; and that the right of the twelve to exercise that exclusive power and authority is taken away by these acts, and others admitted to share that power and authority with them.   Such is, without doubt, the operation of these acts; and it seems to us that this is the whole ground of complaint which the plaintiffs can have. These acts compel the old trustees to sacrifice no private interest whatever, but merely to admit others to aid them in the management of the concerns of a public institution: and if they have no private views to answer, nor private wishes to gratify, in the management of those concerns, (and it would be very uncharitable to suppose they can have, for it is extremely dishonorable to prostitute public interest to private purposes,) it is not very easy to see how this can furnish any very solid ground of complaint.   Had the affairs and concerns of Dartmouth College been their own private affairs and concerns, such an interference would have had a very different complexion.

But the plaintiffs contend that these acts impair their right to manage the affairs of this institution, in violation of that clause of the fifteenth article in our bill of rights which

declares that "no subject shall be arrested, imprisoned, de- "spoiled or deprived of his property, immunities or privi- "leges, put out of the protection of the law, exiled or depriv- "ed of his life, liberty or estate, but by the judgment of his "peers or the law of the land." That the right to manage the affairs of this college is a privilege, within the meaning of this clause of the bill of rights, is not to be doubted. But how a privilege can be protected from the operation of a law of the land, by a clause in the constitution declaring that it shall not be taken away but by the law of the land, is not very easily understood. This clause in our bill of rights seems to have been taken from the 29th chapter of *magna charta.* "No freeman shall be taken or imprisoned, "or be disseized of his freehold, or liberties, or free cus- "toms, or be outlawed or exiled, or any otherwise destroy- "ed, nor will we pass upon him nor condemn him, but by "lawful judgment of his peers, or by the law of the land." The origin and history of *magna charta* is familiar to law- yers and polititions. Sullivan, in his Lectures, 383–4, says that this chapter is the corner stone of English liberties, made in affirmance of the old common law ; and that by the bare reading of it we may learn the extravagancies of king John's reign, which it was intended to redress. It is evi- dent, from all the commentaries upon it by English writers, that it was intended to limit the powers of the crown, and not of parliament. (*Sullivan's Lectures* 383–408.—2 *In- stitute* 45.—4 *Bl. Com.* 423.) Thus the franchises of a corporation are protected by this clause in the great charter, and cannot be taken away by the king, unless by due pro- cess of law in his courts of justice, for a forfeiture incurred. But parliament can dissolve a corporation by statute. 1. *Bl. Com.* 485. The object of the clause in our bill of rights, now under consideration, seems always to have been understood in this state to be the protection of private rights from all interference of single branches of the government, and of individual magistrates, not warranted by law. Thus

if the house of representatives, or the senate, or the governor and council, or even a court, should order an individual to be arrested, or his property to be seized, in a case not warranted by the law of the land, it would be a violation of this clause in the bill of rights.   So if an individual were arrested upon the warrant of a justice of the peace, the cause of which had not been previously supported by oath or affirmation, this clause in the bill of rights would be violated. At this term, in this county, we have decided, in the case of Hutchins vs. Edson, that an arrest upon an execution issuing from this court, but not under seal, which is required both by the constitution and by statute, was a violation of this clause in the bill of rights, and altogether illegal and void.   But all statutes, not repugnant to any other clauses in the constitution, seem always to have been considered as the "law of the land," within the meaning of this clause. Thus, our statute of December 24, 1799, authorizes selectmen and tythingmen, within their respective precincts, to stop persons suspected of travelling unnecessarily on the Sabbath; and, if no sufficient excuse be given, to detain them in custody until a trial can be had; and in the case of *Mayo* vs. *Wilson & al., Cheshire, May,* 1817, we decided after very mature consideration, that an individual who had been duly arrested, and detained in pursuance of that statute, must be considered as having been deprived of his liberty " by the law of the land."

We have public statutes, authorizing the selectmen of towns to take the lands of individuals for highways, and empowering fire-wards " to pull down, blow up or remove any house or buildings," when necessary to stop the progress of fire.   We have private acts, giving to turnpike corporations authority to take the land of individuals for their roads.   Under all these statutes the property of individuals is often taken without their consent; and yet it seems never to have been doubted that those statutes were "the law of the land," within the meaning of the constitution.   By the statute of December 24, 1805, entitled, " an act respecting

idle persons," judges of probate are authorized in certain cases to appoint guardians of idle persons, and thereby take from them all control over both their real and personal estate. This act has been in our statute book nearly twelve years, as a part of "the law of the land," and no one has ever called its validity in question.  By an act of December 11, 1840, (*Laws* 51,) a part of the town of Wendell, in the county of Cheshire, is annexed to New-London, in the county of Hillsborough, and by that act the exclusive power and authority of the former inhabitants of New-London to manage their corporate concerns, is taken away in the same manner that the exclusive authority of these plaintiffs to manage the affairs of Dartmouth College, is taken away. The same thing has frequently been done to other towns. Yet it has never been made a question in our courts, whether those acts were "the law of the land," within the meaning of this clause in the bill of rights.  Indeed, if this clause is to be construed to protect private property and rights from all legislative interference, what construction is to be given to that clause in the twelfth article in the bill of rights, which declares that "no part of a man's property shall be taken "from him, or applied to public uses, without his own con- "sent or that of the representative body of the people?" The cases in which a man's property may be taken from him, and applied to public uses with the consent of the representative body, are not specified.  No one of the acts just mentioned seem to afford to the individuals whose property and privileges may be affected by them, a less solid ground of complaint than the acts in question do to the plaintiffs.  If the latter be repugnant to this clause in the constitution, so must be the former.  There seems to be no substantial difference in the cases, on which a solid distinction can be founded.  If we decide that these acts are not "the law of the land," because they interfere with private right, all other acts interfering with private rights may, for aught we see, fall within the same principle; and what statute does not either directly nor indirectly interfere with

private rights? The principle would probably make our whole statute book a dead letter. We cannot adopt it; but are clearly of opinion that these acts, if not repugnant to any other constitutional provision, are "the law of the land," within the true sense of the constitution.

But it is said that the charter of 1769 is a contract, the validity of which is impaired by these acts, in violation of that clause in the tenth section of the first article of the constitution of the United States, which declares that "No "state shall pass any law impairing the obligations of con- "tracts." It has probably never yet been decided that a charter of this kind is a contract, within the meaning of the constitution of the United States. None of the cases cited were like the present. In the case of *Fletcher* vs. *Peck*, 6 *Cranch* 87, there was an express contract, a conveyance of lands to individuals, for their own use. In the case of *New-Jersey* vs. *Wilson*, 7 *Cranch* 164, there was also an express contract, a treaty, by which lands, with a particular privilege annexed to the lands themselves, were granted to individuals for their own use, and upon a valuable consideration paid.

This clause in the constitution of the United States was obviously intended to protect private rights of property; and embraces all contracts relating to private property, whether executed or executory, and whether between individuals, between states, or between states and individuals. The word "contracts" must, however, be taken in its common and ordinary acceptation, as an actual agreement between parties, by which something is granted or stipulated immediately for the benefit of the actual parties. But this clause was not intended to limit the power of the states in relation to their own public officers and servants, or to their own civil institutions, and must not be construed to embrace contracts which are in their nature mere matters of civil institution; nor grants of power and authority, by a state to individuals, to be exercised for purposes merely public. Thus marriage is a contract; but being a mere matter of civil in-

stitution is not within the meaning of this clause. A law, therefore, authorizing divorces, though it impairs the validity of marriage contracts, is not a violation of the constitution of the United States. Thus, too, many of our penal statutes give a part of the penalties and forfeitures incurred under them to particular individuals; and whenever a penalty or forfeiture is incurred, such individuals have a vested right to sue for and recover such forfeitures and penalties. But a repeal of those acts, at any time before an actual recovery, has always been held to divest this right. 1 *Gallison* 177.—5 *Cranch* 281; and *Lewis* vs. *Foster, Cheshire, May*, 1817. Such repeal, therefore, clearly impairs the validity of the grant; but no one ever supposed that such grant was a contract within the meaning of this clause. In the case of the *Commonwealth* vs. *Bird*, 12 *Mass. Rep.* 443, it was decided that the legislature had a constitutional right to take away from individuals an exemption from military duty, acquired under existing laws: and it seems never to have occurred, either to counsel or the court, that the laws granting the exemption were a contract within the meaning of this clause in the constitution. The legislature, both in this state and in Massachusetts, have always claimed and exercised the right of dividing towns; of enlarging or diminishing their territorial limits; of imposing new duties, or limiting their powers and privileges, as the public good seemed to require, and this without their consent. Yet this right seems never to have been called in question, on the ground that their charters were contracts, within the meaning of this clause. All our judges, justices of the peace, sheriffs, &c. hold their offices under grants from the governor and council, in pursuance of statutes. But who ever supposed that these grants were contracts, within the meaning of this clause of the constitution of the United States? The distinction we have here endeavored to lay down, between the contracts which are, and which are not intended by that instrument, seems to us to be clear and obvious. If the charter of a public institution, like that of

Dart. College
vs.
Woodward.

Dartmouth College, is to be construed as a contract, within the intent of the constitution of the United States, it will, in our opinion, be difficult to say what powers, in relation to their public institutions, if any, are left to the states. It is a construction, in our view, repugnant to the very principles of all government, because it places all the public institutions of all the states beyond legislative control. For it is clear that congress possesses no powers on the subject. We are, therefore, clearly of opinion that the charter of Dartmouth College is not a contract, within the meaning of this clause in the constitution of the United States.

But admitting that charter to have been such a contract, what was the contract? Can it be construed to be a contract on the part of the king with the corporators, whom he appointed, and their successors, that they should forever have the control of the affairs of this institution, and be forever free from all legislative interference, and that their number should not be augmented or diminished, however strongly the public interest might require it? Such a contract, in relation to a public institution, would, as we conceive, be absurd, and repugnant to the principles of all government. The king had no power to make such a contract, and thus bind the sovereign authority on a subject of mere public concern. Nor does our legislature possess the power to make such a contract. Had it been provided in the act of June, 1816, that the twenty-one trustees should forever have the exclusive control of this institution, and that no future legislature should add to their number, does any one suppose such a provision would have been binding upon a future legislature? Or suppose the legislature should enact that the number of judges of this court should never be augmented, is it possible to suppose that such an act could abridge the power of a succeeding legislature on the subject? We think not. A distinction is to be taken between particular grants, by the legislature, of property or privileges to individuals, for their own benefit, and grants of power and authority to be exercised for public purposes. The for-

Dart. College
*vs.*
Woodward.

mer is in its nature special legislation, in relation to private rights; the latter is general legislation, in relation to the common interests of all. Chief justice Marshall, in the case of *Fletcher* vs. *Peck*, 6 *Cranch* 135, adverts to this distinction, where he says " the correctness of this principle, " that one legislature cannot abridge the powers of a suc- " ceeding legislature, so far as respects general legislation, " can never be controverted. But if an act be done under " a law, a succeeding legislature cannot undo it. The past " cannot be recalled by the most absolute power. Convey- " ances have been made; those conveyances have vested " legal estates, and if those estates may be seized by the " sovereign authority, still that they originally vested, is " a fact and cannot cease to be a fact." We are, therefore, of opinion that if this charter can be construed to be a con- tract, within the meaning of the constitution of the United States, yet still it contains no contract binding on the legis- lature, that the number of trustees shall not be augmented, and that the validity of the contract is not impaired by these acts.

I have looked into this case with all the attention of which I am capable, and with a most painful anxiety to discover the true principles upon which it ought to be decided. No man prizes more highly than I do the literary institutions of our country, or would go farther to maintain their just rights and privileges. But I cannot bring myself to believe that it would be consistent with sound policy, or ultimately with the true interests of literature itself, to place the great pub- lic institutions, in which all the young men destined for the liberal professions are to be educated, within the absolute control of a few individuals, and out of the control of the sovereign power—not consistent with sound policy, because it is a matter of too great moment, too intimately connected with the public welfare and prosperity, to be thus entrusted in the hands of a few. The education of the rising gen- eration is a matter of the highest public concern, and is worthy of the best attention of every legislature. The im-

Dart. College
*vs.*
Woodward.

mediate care of these institutions must be committed to individuals, and the trust will be faithfully executed so long as it is recollected to be a mere public trust, and that there is a superintending power that can and will correct every abuse of it. But make the trustees independent, and they will ultimately forget that their office is a public trust—will at length consider these institutions as their own—will overlook the great purposes for which their powers were originally given, and will exercise them only to gratify their own private views and wishes, or to promote the narrow purposes of a sect or a party. It is idle to suppose that courts of law can correct every abuse of such a trust. Courts of law cannot legislate. There may be many abuses which can be corrected by the sovereign power alone. Nor would such exemption from legislative control be consistent with the true interests of literature itself, because these institutions must stand in constant need of the aid and patronage of the legislature and the public; and without such aid and patronage they can never flourish. Their prosperity depends entirely upon the public estimation in which they are held. It is of the highest importance that they should be fondly cherished by the best affections of the people; that every citizen should feel that he has an interest in them, and that they constitute a part of that inestimable inheritance which he is to transmit to his posterity in the institutions of his country. But these institutions, if placed in a situation to dispute the public will, would eventually fall into the hands of men who would be disposed to dispute it, and contests would inevitably arise, in which the great interests of literature would be forgotten. Those who resisted that will would become at once the objects of popular jealously and distrust; their motives, however pure, would be called in question, and their resistance would be believed to have originated in private and interested views, and not in a regard to the public welfare. It would avail these institutions nothing that the public will was wrong, and that their right could be maintained in opposition to it, in a court of law. A triumph there

might be infinitely more ruinous than defeat. Whoever
knows the nature of a popular government, knows that such a contest could not be thus settled by one engagement. Such a triumph would only protract the destructive contest. The last misfortune which can befal one of these institutions is to become the subject of popular contention.

I am aware that this power in the hands of the legislature may, like every other power, at times be unwisely exercised; but where can it be more securely lodged? If those whom the people annually elect to manage their public affairs, cannot be trusted, who can? The people have most emphatically enjoined it in the constitution, as a duty upon " the " legislators and magistrates, in all future periods of the " government, to cherish the interests of literature and the " sciences, and all seminaries and public schools." And those interests will be cherished, both by the legislature and the people, so long as there is virtue enough left to maintain the rest of our institutions. Whenever the people and their rulers shall become corrupt enough to wage war with the sciences and liberal arts, we may be assured that the time will have arrived when all our institutions, our laws, our liberties, must pass away; when all that can be dear to freemen, or that can make their country dear to them, must be lost, and when a government and institutions must be established of a very different character from those under which it is our pride and our happiness to live.

In forming my opinion in this case, however, I have given no weight to any considerations of expediency. I think the legislature had a clear constitutional right to pass the laws in question. My opinion may be incorrect, and our judgment erroneous; but it is the best opinion which, upon the most mature consideration, I have been able to form. It is, certainly, to me a subject of much consolation, to know that if we have erred, our mistakes can be corrected, and be prevented from working any ultimate injustice. If the plaintiffs think themselves aggrieved by our decision, they

can carry the cause to another tribunal, where it can be
reëxamined, and our judgment be reversed or affirmed, as
the law of the case may seem to that tribunal to require.

*Judgment for the defendant.*