# THE STATE *v.* CANTERBURY.

# THE STATE *v.* BOSCAWEN.

Towns, bounded by or on the Connecticut or Merrimack rivers, or by lines up or down the river, extend to the centre of the river.

Towns, extending to the centre of a river, are liable to indictment, for neglect to build that part of a bridge necessary to be built in their town, to make a new public highway across a river passable.

Road commissioners have the like powers as selectmen, to lay out highways over existing ways and bridges, and to award damages for the franchise.

An award of a gross sum, "to be paid equally by both towns," for a franchise of a bridge in those towns, is a sufficient award of the sum to be paid by each town.

The record of the laying out of a highway, by the court of common pleas, is conclusive, and cannot be collaterally impeached, unless the objection goes to the jurisdiction of the court.

An award of damages to a bridge corporation, for "their easement, interest and franchise, in and to be found," &c., is a sufficient award for the franchise of a toll-bridge.

Commissioners are authorized to lay out highways, including all bridges thereon.

Evidence that the highway for which an indictment is found, is not connected with any other highway, is admissible, as bearing on the question whether the neglect to repair is a nuisance.

If one offence is stated in several counts, in good faith, the prosecutor cannot be required to elect on which counts he will proceed.

Judgment will be rendered on a verdict, if either of several counts is sufficient.

Towns are liable to indictment for not building and repairing bridges, as parts of the highways in which they are situate.

An indictment for not repairing a highway, or for not making a new highway, is insufficient, where the neglect is to build or repair a bridge.

Such indictment should charge the neglect to make or repair a bridge in the highway.

A count in an indictment for not making a new highway, without stating that it needs making, or is bad and not safe, is insufficient.

A count in an indictment, charging that there is a public bridge in the highway, and that it is unmade, ruinous, &c., is not supported by evidence that a new highway has been laid out across a river, and that a new bridge is required; the allegations should be according to the facts.

The State *v.* Canterbury.—The State *v.* Boscawen.

An INFORMATION against the town of Canterbury, for neglect to build part of a bridge, was as follows:

### STATE OF NEW HAMPSHIRE.

#### MERRIMACK, SS.

*Court of Common Pleas, in vacation after October term, A. D. 1851.*

Be it remembered that John H. George, solicitor for the county of Merrimack aforesaid, being before the court, gives the said court to understand and be informed that on, &c., (Jan. 1, 1852,) there was, ever since has been, and still is, a new public highway in the towns of Canterbury and Boscawen, in said county, duly laid out and established by law, as follows, that is to say:—beginning at a stake standing in the centre of the old road leading from the dwelling-house formerly occupied by Moody Emery, in said Canterbury, to Boscawen Plain, so called, thirty-six feet northeasterly of the Canterbury toll-bridge, in said town of Canterbury, and proceeding from thence south forty-five and one-fourth degrees west thirty-six feet to said Canterbury toll-bridge, thence the same course over and across said bridge, so far as it remains standing in said Canterbury, two hundred and twenty-two feet to the centre of Merrimack river, it being the west line of the said town of Canterbury, thence the same course across said river over and upon that part of said bridge, standing two hundred and twenty-two feet in the town of Boscawen to the west bank of said river, in said Boscawen, thence the same course sixty-six feet, to a stake standing in the centre of the old road leading from said Moody Emery's former dwelling-house to the highway leading through Boscawen Plain, so called, at the southerly end of the stable connected with the tavern formerly occupied by William P. Heath, in Boscawen aforesaid, and that the part of said highway so situated in said Canterbury, beginning at a stake standing in the centre of the old road leading from Moody Emery's former dwelling-house, in said Canterbury, to Bos-

cawen Plain, so called, thirty-six feet northeasterly of the Canterbury toll-bridge, in said town of Canterbury, and proceeding from thence south forty-five and one-fourth degrees west thirty-six feet to said Canterbury toll-bridge, thence the same course over and across said bridge, so far as it remains standing in said Canterbury, two hundred and twenty-two feet to the centre of Merrimack river, it being the west line of said town of Canterbury, is four rods in width and two hundred and fifty-eight feet in length, and the above described line is the centre of said part of said highway, of all which the said town of Canterbury has had due notice; and the solicitor aforesaid gives the court further to understand and be informed, that the said part of said highway, in Canterbury aforesaid, was, on the first day of January last past, ever since has been, and still is, rocky, hilly, broken, uneven, unfinished, and in want of due making thereof, so that the good citizens of this State, for and during the time aforesaid, could not and still cannot pass and re-pass, in and through the said last-mentioned part of said highway, situated in Canterbury aforesaid, as they ought to do, without great danger of their lives and loss of their goods, and that the said town of Canterbury, during all the time aforesaid, were and still are by law, holden and bound the said part of said highway, situated in Canterbury aforesaid, to make and put in good repair; yet the said town of Canterbury, during all the time last aforesaid, did unreasonably neglect and refuse, and still does unreasonably neglect and refuse to make and put in good repair the said last-mentioned part of said highway, situated in Canterbury aforesaid, so unmade as aforesaid, to the great damage and common nuisance of all the good citizens of said State, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State.

Whereupon the said solicitor prays advice of the court in the premises, and that due process of law may issue against the said town of Canterbury in this behalf, to answer to the

said State in the premises, and to do therein what to law and justice may appertain.

And the solicitor aforesaid, for the county aforesaid, being before the court, gives the said court further to understand and be informed, that at the term of said court of common pleas, held at Concord, within and for said county of Merrimack, on the second Tuesday of October, in the year of our Lord one thousand eight hundred and forty-eight, a new highway was, on the petition of Benjamin Sanborn and others, duly laid out and established as and for a public highway, in the towns of Boscawen and Canterbury, in said county of Merrimack, beginning at a stake standing in the centre of the old road, leading from the dwelling-house then occupied by Moody Emery, in said Canterbury, to Boscawen Plain, so called, thirty-six feet northeasterly of the Canterbury toll-bridge, in said town of Canterbury, and proceeding from thence south forty-five and one-fourth degrees west thirty-six feet to said Canterbury toll-bridge, thence the same course over and across said bridge, so far as it remains standing in said Canterbury, two hundred and twenty-two feet to the centre of Merrimack river, being the west line of said town of Canterbury, thence the same course across said river over and upon that part of said bridge standing, two hundred and twenty-two feet in the town of Boscawen, to the west bank of said river in said Boscawen, thence the same course sixty-six feet, to a stake standing in the centre of the old road leading from said Moody Emery's dwelling-house to the highway leading through Boscawen Plain, so called, at the southerly end of the stable connected with the tavern then occupied by William P. Heath, in Boscawen aforesaid, which highway was laid out four rods in width, and the above-described line is the centre of said highway, and the said town of Canterbury was by said court so holden as aforesaid, ordered to build and complete that portion of said highway so laid out as aforesaid, within the said town of Canterbury, to wit:

beginning at a stake standing in the centre of the old road leading from Moody Emery's former dwelling-house, in said Canterbury, to Boscawen Plain, so called, thirty-six feet northeasterly of the Canterbury toll-bridge, in said town of Canterbury, and proceeding from thence south forty-five and one-fourth degrees west thirty-six feet to said Canterbury toll-bridge, thence the same course over and across said bridge, so far as it remains standing in said Canterbury, two hundred and twenty-two feet to the centre of Merrimack river, it being the west line of said town of Canterbury, on or before the first day of October, in the year of our Lord one thousand eight hundred and forty-nine; all of which appears from the records of this court; yet the said town of Canterbury, during all the time subsequent to the laying out of said highway as aforesaid, and prior to said first day of October, in the year of our Lord one thousand eight hundred and forty-nine, did refuse and neglect, and still doth refuse and neglect to build and complete that portion of said highway so laid out as aforesaid in the town of Canterbury aforesaid, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State; wherefore the said solicitor prays the advice of the court in this behalf, and that due process of law may issue to said town of Canterbury, to answer to said State in the premises, and to do therein what to law and justice may appertain.

And the solicitor aforesaid, for the county aforesaid, being before the court, gives the said court further to understand and be informed, that on the first day of January, in the year of our Lord one thousand eight hundred and fifty, there was, ever since has been, and still is, a certain common and public bridge across Merrimack river, so called, duly laid out, situate and being in the towns of Boscawen and Canterbury, in the said county of Merrimack, in the common highway leading from and by the dwelling-house formerly occupied by Moody Emery, in Canterbury aforesaid, to Boscawen

Plain, so called, being a common highway for all the good citizens of said State, on foot, and with their horses, coaches, carts, and other carriages, to go, pass and repass, ride and labor, and that that part of the said common and public bridge, so situated in Canterbury aforesaid, which is four rods in width, on the said first day of January aforesaid, was, ever since has been, and still is, unmade, unfinished, ruinous, broken, dangerous, and in great decay, for want of building and of needful and necessary upholding, maintaining, amending and repairing the same, so that the good citizens of said State, in, upon, and over the said bridge, on foot and with horses, coaches, carts and carriages could not and cannot pass and repass, ride and labor, without great danger of their lives and loss of their goods, as they ought and were accustomed to do and of right ought to do, and that the town of Canterbury aforesaid of right have been, and still of right are bound to build, repair, and amend that part of said common and public bridge, so situated in the town of Canterbury aforesaid, when and so often as it shall be necessary; to the great damage and common nuisance of all the said citizens upon and over the said bridge, on foot and with their horses, coaches, carts and other carriages about their necessary affairs and business, going, returning, passing, riding and laboring; contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State; wherefore the said solicitor prays the advice of the court in the premises, and that due process of law may issue against the said town of Canterbury in this behalf, to answer to the said State in the premises, and to do therein what to law and justice may appertain.

JOHN H. GEORGE, *Solicitor.*

To sustain the prosecution, the record of the laying out of said new highway was offered in evidence; and in the re-

port of the road commissioners said highway, as laid out by them, is described as follows:

" Commencing at a stake, standing in the centre of the old road leading from Moody Emery's, in said Canterbury, to Boscawen Plain, thirty-six feet northeasterly of the Canterbury toll-bridge, in said town, and proceeding from thence south forty-five and one-fourth degrees west thirty-six feet to said Canterbury toll-bridge ; thence the same course over and across said bridge, so far as it remains standing, in said Canterbury, two hundred and twenty-two feet to the centre of the Merrimack river, it being the west line of said town of Canterbury ; thence the same course across said river, over and upon that part of the bridge standing two hundred and twenty-two feet in the town of Boscawen, to the west bank of said river in said Boscawen ; thence the same course sixty-six feet to a stake standing in the centre of the old road leading from said Moody Emery's to the highway leading through Boscawen Plain, so called, at the southerly end of the stable connected with the tavern now occupied by William P. Heath, in Boscawen aforesaid."

The award of damages, in said report, is in the following words, to wit :

" The commissioners award and assess as damages to the proprietors of the Canterbury Bridge, a corporation duly established by law, for their easement, interest and franchise, in and to land on which the aforesaid bridge is situated, with the bridge on the same part of said highway, and the land passed over by the bridge and at each end of the same, and the land passed over by said highway, the sum of five dollars, to be equally paid by the said towns of Canterbury and Boscawen."

It was proved, on the part of the prosecution, that there was no bridge, nor any portion of one, at the place described in said report, at the time of filing the information. The piece of road leading to said bridge, of thirty-six feet in length, and which had been before used as a road, was,

however, in a passable condition, and was not proved to be defective.

The act, incorporating said town, was also offered in evidence, on the part of the prosecution, in which the description of the boundaries of said town is as follows:

" Beginning at the easterly side of Merrymac River, on a course north seventy-three degrees east from the mouth of Contoocook River, from thence continuing ye same course about six hundred and six rods to Canterbury south side line, from thence north west by said Canterbury side line to Merrymac River, thence down the said river to the place began at."—*Extract from act adding a tract of land to Canterbury, passed June* 13, 1765.

In the charter of Canterbury, granted May 27, 1727, the boundaries of the town are thus given:

" To begin at the head of the town of Chichester, and to run northwest by the town of Gilmanton to Winaposauque Pond or river that runs westerly out of said pond, and from the first place where it began, then to run southwest seven miles on the head of the aforesaid town of Chichester, and then to run northwest to the aforesaid river that comes out of the pond aforesaid, and then the river to be the bounds on the northwest end."

The respondents contended that Canterbury was bounded by the easterly bank of the Merrimack river, and offered in evidence various acts of the Legislature, for the purpose of showing the annexation of islands and of the territory extending to the centre of the rivers Merrimack and Connecticut to the adjacent towns; the boundary of which, upon those rivers, was substantially the same as that of Boscawen and Canterbury; and recitals in those acts that the towns did not extend beyond the banks of those rivers.

They also offered to prove that there was an incorporated company, which had a right by its charter to erect and maintain a toll-bridge at the place where said new highway was laid out; and that said company had for many years main-

tained a toll-bridge at that place, part of which was standing when the report of the commissioners, laying out said new highway, was made; and that there was no public highway extending on either side of the river to said bridge.

All this evidence was rejected by the court, and a verdict of guilty was returned, which the respondents move to set aside for the following reasons:

1. Because the court refused to rule that the prosecutor should elect upon which count in the information the trial should be had.

2. Because the court ruled that, on this information, the defendants might be convicted for not building a bridge across Merrimack river, if a bridge across the same was necessary.

3. Because the court ruled that the town of Canterbury, by its charter and additional act, extended to the centre of Merrimack river.

4. Because the court rejected the evidence, offered by the defendants, that the Legislature had, by statute, in the case of many other towns bounded by the Merrimack and Connecticut rivers, in the same terms as Boscawen and Canterbury, annexed the land to the centre of those rivers and islands therein to the adjacent towns, on the ground, as recited in those statutes, that their chartered limits did not extend to the centre, but only to the banks.

5. Because the court rejected the evidence that there was an incorporated company, with a right to maintain a bridge, and which had long maintained one, at the point on the river where the highway, described in the information, crosses the same, and to which no public highway extended on either side.

6. Because the court overruled the exception taken to the sufficiency of the award of damages made to the Canterbury Toll Bridge Company.

7. Because the court ruled that, on the several counts of

the information, the town might be convicted for not mak-
ing a new bridge.

The respondents also moved in arrest of judgment on the
following grounds:

1.  Because the information was filed in vacation, and is
entitled as an information presented to the court by the solic-
itor in person; and is not alleged to be filed; and because
the absence of the attorney general is not alleged.

2.  Because a general verdict was taken on all the counts,
the first count being defective in not setting forth how the
highway described in it became such, nor that it was laid
out on petition, nor that a time was fixed within which the
highway should be built, which had elapsed; the second
count not alleging that said highway was laid out on the
report of or by the county commissioners; and the third
count not alleging the highway or bridge to be a new high-
way, laid out according to law, though its not being made
was alleged as part of the offence.

3.  Because neither of the counts, though they describe a
highway across Merrimack river, allege that the highway
was impassable by reason of the water of the river, or from
any other cause which could have existed and which is defi-
nitely alleged.

4.  Because the information is, in other particulars, un-
certain and defective.

An information against the town of Boscawen was in the
same form, except that it applied to that part of the same
bridge, which is between the centre of the river and the
westerly bank.

The boundaries of that town, as described in its charter,
were as follows:

" Beginning at the southerly side of Contoocook river's
mouth, where the same falls into Merrimack river, and run-
ning thence on a course west seventeen degrees south, seven
miles and one hundred rods, measured from a forked white
pine, near the mouth of Contoocook river, to a pitch pine

and heap of stones, and from said pitch pine and heap of stones running north seventeen degrees west seven miles to a forked beach, marked, and thence on a course east seventeen degrees north to Merrimack river to a heap of stones, and thence by the river (as the same runs) to the mouth of Contoocook river again, where it begun."

In other respects the cases were the same, and were argued and considered together.

*Fowler,* for the defendants.

I.  The court erred in ruling that, upon the information in this case, the defendants might be convicted for not building a bridge across Merrimack river, if a bridge across the same was necessary.  The information, in none of its counts, contains a description of such an offence as not building a bridge.  In order to warrant a conviction for such offence, it should have contained not only a definite description of the offence, but a statement of the particular facts constituting it.  *Tennessee* v. *Fields,* M. & Y. 137; *Rex* v. *Slearwin,* 1 East. P C. 341, 421.  An indictment must allege all the material facts necessary to be proved, in order to procure a conviction.  *State* v. *Philbrick,* 31 Maine Rep. (1 Red.) 401.

II.  The information, in this case, is defective in all its counts, in not averring the place at which the town of Canterbury committed the offence alleged.  It is also alike defective, in all its counts, in not alleging the time when the alleged offence was committed.  The time at which the offence charged took place, must be positively averred. *Anon.* Lofft. 228.  Time and place must be added to every material fact in an indictment.  *Rex* v. *Holland,* 5 D. & E. 607.  Stating the defendant to be late of W., and laying the offence to be at the parish aforesaid, was held not to be sufficiently certain.  *Rex* v. *Matthews,* 5 D. & E. 162.

III.  The third count of the information, which is the only one that any where approximates to a description of

the offence intended to be charged, is materially defective, in not containing any substantive allegation whatever of any offence or neglect of the defendants. It alleges, by way of recital, that the defendants were bound to build, repair and amend said bridge as often as necessary, to the great damage and common nuisance of the good citizens of this State, contrary to the form of the statute, &c., and this is all. It is nowhere averred that the defendants neglected to build, repair and amend, as they were bound to do. This must be fatal.

IV. The first and second counts are fatally defective, in that they do not describe the offence intended to be charged with any proper degree of definiteness. Every person accused is entitled to know from the indictment what the offence is which he is to meet upon the trial. This the defendant could not infer, nor any one else, from the allegations of either of the two first counts. No one, from them, could infer that the town was charged with neglecting to build a bridge across the Merrimack river.

V. The court erred in overruling the exception to the sufficiency of the award to the proprietors of the Canterbury toll-bridge. By their charter, that corporation had the right to maintain a bridge and take toll, at the point where the new highway was laid out, and had long maintained one there, and this right was exclusive. For their franchise no award of damages was made, as there should have been; and it could only be taken by an award of compensation therefor.

VI. The right of maintaining a bridge and taking toll, at the point of the proposed highway, still remaining in the proprietors, the town of Canterbury would be trespassers in erecting, at the same point, another bridge for the free passage of the public, and liable therefor. The building of the proposed new bridge would be an illegal act, and an information or indictment will not lie for neglecting to do an illegal act.

VII. The grounds of the motion in arrest of judgment are well taken and valid.

*James Bell*, on the same side.

I. At common law, neither parishes nor counties could be compelled to build bridges across rivers, and counties alone could be compelled to keep them in repair. 1 Bac. Ab. Bridges J. 330; 2 Chitt. C. L. 355; *King* v. *County of Bucks*, 12 East 192. If not laid out according to the provisions of the statutes of this State, the towns are not now bound to build. *Commonwealth* v. *Charlestown*, 1 Pick. 180; *Robbins* v. *Bridgewater*, 6 N. H. Rep. 524; *Arundell* v. *McCulloch*, 10 Mass. Rep. 70.

II. Towns in New Hampshire, bounded on the Connecticut and Merrimack rivers, do not extend to the centre of those rivers. The determining of their boundaries is under the absolute control of the Legislature, which may adopt their own rules of construction. *Gorham* v. *Springfield*, 8 Shep. 58; *Hooper* v. *Emery*, 2 Shep. 375. The general rule, in regard to rivers as boundaries, may be controlled by evidence of intention, resulting from the localities, the language, &c., in each particular case. *Reed's Petition*, 13 N. H. Rep. 384; *Webber* v. *Eastern Railroad*, 2 Met. 47; *Jackson* v. *Hathaway*, 15 John. 147; *Orandorf* v. *Steele*, 2 Barb. S. C. 126; *Tyler* v. *Hammond*, 11 Pick. 193. And the general course of legislation, and other statutes upon the same subject, are to be regarded in giving a construction to the charters of the defendant towns. 4 Bac. Ab. Stat. I, p. 646; 1 Kent's Com. 463; *Holbrook* v. *Holbrook*, 1 Pick. 254; *Fort* v. *Burch*, 6 Barb. 60.

The defendants refer to the acts incorporating Springfield and Goffstown, and to that annexing to the latter town the islands at Amoskeag Falls. Also to the acts incorporating Lyman, Haverhill, Lyme, Plainfield, Cornish and Walpole, which, upon the construction claimed by the counsel for the State, are bounded by the centre of Connecticut river; and the acts annexing islands in Connecticut river to each of

those towns, some of which describe the islands as lying *between* Haverhill and Newbury, &c.; and the acts of July 6, 1795, and of 1834, extending the lines of the towns, bounding upon the Connecticut, to the west bank of the river; the first of which recites that those towns are bounded by the east ·bank of the river. Laws, (ed. 1815) 247; Laws (1834) 166; Rev. Stat. ch. 37, § 1. See also cases in Pennsylvania, stated in 3 U. S. Dig. 355; *Pratt* v. *State*, 5 Conn. 388; cases in North Carolina referred to in 5 U. S. Dig. 709.

III. The laying out of this highway or bridge was illegal, because the county commissioners had no power to lay out a highway over one already constructed by an incorporated company, under the authority of its charter.

1. They have not authority, like selectmen of towns, by the statute, to lay a highway over one already existing. Comp. Stat. ch. 135, § 9; Ibid. ch. 137, § 1; *Barber* v. *Andover*, 8 N. H. Rep. 398; *Wellington's Petition*, 16 Pick. 103.

2. They cannot lay them out over turnpike roads or toll-bridges, as the defendants offered to show this to be. *Barber* v. *Andover*, 8 N. H. Rep. 398; *West Boston Bridge* v. *County Commissioners*, 10 Pick. 270.

3. They, in this case, made no proper award of damages for the franchise, which is merely a privilege, but only for land, and their proceedings are, therefore, invalid. *West Boston Bridge* v. *County Commissioners*, 10 Pick. 270; *Newbury Turnpike* v. *Miller*, 5 John. Ch. 100; 3 Kent's Com. 37; *Dartmouth College* v. *Woodward*, 5 Wheat. 519, 559.

4. The commissioners did not comply with the statute, by making a separate award of the damages for the land in each town. Comp. Stat. p. 140, § 7; 142, § 1, 3, 6.

5. Only bridges upon highways can be laid out under that designation by the statutes of this State; and the defendants offered to show that there was no highway leading to this bridge, which evidence was rejected. Comp. Stat. p.

45, § 21 ; 144, § 7. At common law, bridges across rivers are not parts of the highway, but are entirely distinct in relation to their construction and support. 1 Bac. Ab. Bridges; 5 Burr. 2594; 2 East 349; 7 East 596; 5 Taun. 284; 2 M. & S. 262; 2 Chitty's Crim. Law 355. The towns could not have had access to the place where this bridge was to be built, except by an act of trespass. *Todd* v. *Rome,* 5 Greenl. 55; *State* v. *Bailey,* 1 Foster's Rep. 185.

IV. The court erred in admitting evidence under the first and third counts, of the neglect of the defendants to construct a highway or bridge laid out but not made, as the gravamen in these counts is the neglect to keep in repair a highway or bridge in use. They are not good counts for neglecting to build, because they do not state how the liability arose. 2 Chitty's Crim. Law 339; 5 Burr. 2700; *King* v. *Pender-rhyn,* 2 T. R. 513. They should have stated by what authority the highway or bridge was laid out; that it was done upon petition, &c. 1 Chitty's Crim. Law 227, 228, 232, 142; 2 Hale 183–4; Hawk. B. 2, ch. 25, § 57; Cro. El. 147; 1 Bac. Abr. Indt. G. 1; 2 Stra. 1226; Cowp. 683; *Commonwealth* v. *Peters,* 3 Mass. Rep. 229; *Commonwealth* v. *Newburyport Bridge,* 19 Pick. 141.

V. The court erred in admitting evidence of the defendants' neglect to build a bridge under the first and second counts, which do not describe that offence. 2 Chitty's Crim. Law 339; N. H. Bill of Rights, art. 15; Leach C. C. 422; 2 Ld. Raym. 69, 586; 2 Hale 169; 2 M. & S. 386; 2 Stra. 904; *Commonwealth* v. *Hall,* 15 Mass. Rep. 240; *State* v. *Maxwell,* 2 Pick. 139.

The precedents of indictments, in cases of defective bridges, uniformly describe that offence specifically. 2 Ld. Raym. 1174; *Reg.* v. *Sainthill,* 2 Chitty's Crim. Law 355, 358, 360, 365, *Rex* v. *St. Weonard,* 5 C. & P. 579; *Wilde* v. *Commonwealth,* 2 Met. 408; *Commonwealth* v. *Newburyport Bridge,* 9 Pick. 142. See also *Rex* v. *Oxfordshire,* 1 B. & A. 289, cited by the counsel for the State. The act

prescribing the sense in which certain words, used in the statutes, shall be taken, has no application to this case. It is not sufficient merely to describe the offence in the words of the statute. 2 Hawk. P. C. 249; 5 Bac. Ab. Indt. H. p. 113; 1 Chitty's Crim. Law 232, 235.

The defendants move in arrest of judgment,

I. Because the caption of the information is defective in not stating the county to which the court referred to in it belonged. And there is also a repugnancy between the caption and the information, which purports to have been presented by the solicitor, personally in court. 1 Salk. 195, 376; 2 Hawk. P. C. 253; 1 T. R. 319; 1 Chitty's Crim. Law, 268, 272, and the authorities there referred to as to the captions of indictments. 1 Chitty's Crim. Law 688, 703; 4 Burr. 2556; *King* v. *Fearnley*, Leach 361.

II. All the counts in this information are bad.

1. The first and third counts, if they can be considered as founded upon a neglect to build a bridge, laid out but not made, are insufficient, for the reasons already assigned.

2. The first and second counts are defective, if regarded as founded upon a neglect to build a bridge, in not containing a more certain and definite description of that offence.

The second count is also defective, in not alleging that the highway or bridge was laid out by the road commissioners, or upon their report. It does not allege that the town " unreasonably " neglected, &c., which is the statute description of the offence. 1 Chitty's Crim. Law 232, 235; 3 Bac. Ab. Indt. H. p. 113. Nor does it lay the offence to have been " to the common nuisance," &c., which is essential. 2 Stra. 688.

3. The third count is for want of the repairs of a common and public bridge, and is not a description of the offence of not erecting a new one under the statute. Comp. Stat. 144, § 1, 2. And neither this nor the other counts describe, in the terms of the statute, the offence made punishable by the last clause of the same section. The material

The State *v.* Canterbury.—The State *v.* Boscawen.

words of the statute description of the offence should have been used. 2 Hawk. P. C. 249; 3 Bac. Ab. Indt. H. p. 113; 1 Chitty's Crim. Law 232, 235.

III. The defendants may take advantage of these exceptions as well in this mode as they could have done by a demurrer. 4 T. R. 490; 5 T. R. 162; Leach 300; and they are not aided by the verdict. 1 Chitty's Crim. Law 185, 186; Hawk. b. 2, ch. 25, § 77; 5 East 244; 4 Black. Com. 375; 3 Burr. 1901; 1 East 146.

*Perley*, and *George*, solicitor, for the State.

I. The State were not required to elect on which count of the indictment the town should be tried. *Kane* v. *People*, 8 Wend. 211; *State* v. *Flye*, 26 Maine Rep. 312; *Mc Gregg* v. *State*, 4 Blackf. 101; *United States* v. *Dickinson*, 2 Mc-Lean 325; 5 U. S. Dig. 151, pl. 181; *State* v. *Hogan*, R. M. Charl. 474; 5 U. S. Dig. 151, pl. 182.

II. A bridge, in the course of the highway, is part of the highway, and when a highway is laid out over a stream which requires a bridge, the town is bound to make a bridge as part of the highway. Com. Dig. Chemin, B. 1; *State* v. *Gilmanton*, 14 N. H. Rep. 467; *Perley* v. *Chandler*, 6 Mass. Rep. 458.

The statute (Comp. Stat. p. 45, § 21,) provides that the words highway or road shall include all bridges thereon; and there is no statute that makes a town liable to indictment for neglect to make or repair a bridge by that name. Under the count in the indictment for neglect to make the highway, the town are liable for neglect to make a bridge, necessary to the construction of the highway, or a part of it. But the last count is for neglect to make the bridge. It alleges that the part of the bridge in Canterbury was *unmade* for want of *building* the same bridge. Other allegations do not destroy the effect of these, but may be rejected as surplusage. *State* v. *Kittery*, 5 Greenl. 254.

III. The line of Canterbury is given in the act of incor-

poration, extending *to the river*, thence down the river to the first bound, and there is no other limitation to the line. In such case, the boundary is the centre of the stream. So where the line runs to a monument by the river. *Claremont* v. *Carlton*, 2 N. H. Rep. 369 ; *State* v. *Gilmanton*, 9 N. H. Rep. 461 ; *Reed's Petition*, 13 N. H. Rep. 384 ; *Lowell* v. *Robinson*, 16 Maine Rep. 357.

IV.   Acts of the Legislature, defining or changing the limits of towns, are public and taken notice of judicially. They are not to be proved to the jury as matters of fact. This court will now decide as matter of fact whether any act of the Legislature has changed or affected the boundaries of the towns.   *Commonwealth* v. *Springfield*, 7 Mass. Rep. 9.

The Legislature have no power to give a judicial construction to a prior act.   We are not acquainted with any acts of the Legislature such as the defendants offered to show.   Notwithstanding such acts, if any such there be, it has been decided that a boundary, like that given in this case, carries the line to the centre of the stream.   *Claremont* v. *Carlton*, and *State* v. *Gilmanton*, before cited.

The general rule, in the case of grants of land bounded by a river, is conceded.   No distinction can be established between the construction of a grant of a township of land to the proprietors, and the grant of corporate powers to the inhabitants of the land by the same description.   The town must hold jurisdiction to the same extent as the proprietary grant reaches.   How does the Merrimack differ from other rivers ?   The Pemigewasset is the same stream.   The case of Pont Fayette settles the construction as to that.   It was a petition for a new highway across a bridge ; a contested case.   The highway was established.   And the boundary between the towns was established at the centre of the stream, measuring from bank to bank.   Another bridge across the Merrimack has been laid out by the court, only three miles below the bridge here in controversy.   This

shows that there is no such distinction as is claimed between the Merrimack and its tributaries.

The case of the Connecticut differs from that of the Merrimack. The State extends to the west bank; the towns upon our construction extended only to the centre of the river. The islands might be west of the centre.

There would be great inconvenience and absurdity in leaving the whole course of these rivers without the limits of any town. This was probably the reason of extending the boundaries of the towns on the Connecticut to the west bank.

It would be extraordinary to hold that acts of the legislature, merely fixing and defining the limits of certain towns, should be held to alter the rules of construction as to others.

V. The statute expressly gives the power to take for a highway any real estate, franchise, or easement of any corporation, in the same manner as the real estate of individuals. Com. Stat. 136, § 11.

The court of common pleas had jurisdiction of the petition and the cause, and the judgment of that court establishing the highway is conclusive. *Dudley* v. *Butler*, 10 N. H. Rep. 281 ; *State* v. *Gilmanton*, 14 N. H. Rep. 474.

A toll bridge is real estate. *Meason's Estate*, 4 Watts, 341. (1 U. S. D. 482, pl. 1.)

VI. The award of damages was right, and if not, the question cannot be considered now ; it is concluded by the judgment of the common pleas.

VII. The defendants may be charged for neglect to build the bridge, under the count which alleges that they neglected to build the highway. See I.

The powers of the solicitor to file informations against towns, is not limited to cases where the attorney general is absent. He is bound to discharge all the duties of the attorney general in his absence ; but his official powers as solicitor are not superseded by the presence of the attorney

general; and one of these, by the express grant of the statute, is to file informations.   Com. Stat. 144, § 2.

It is not necessary that the information should itself show the absence of the attorney general, any more than an indictment found by the solicitor should state such absence, or the legal qualifications of the jurors, who make the presentment.   1 Chitt. Cr. Law, 844; *Rex* v. *Wilkes*, 4 Burr. 2553.

The town is bound, of common right, to make and repair highways and bridges, and in such case it is never necessary to show how the defendants are chargeable with the duty. In England, of common right, the parish is bound to repair roads, and the county bridges.   But there are instances in which townships and individuals are bound *ratione tenuræ*, and by prescription, to repair; and in these instances the indictment or information must show the special ground on which the defendants are to be charged.   2 Saund. 158, n. 4; *The King* v. *Sheffield*, 2 T. R. 106; *The King* v. *Penderryn*, 2 T. R. 513; 2 Ch. Cr. Law, 570, 595.

It is not necessary to state in what particulars, or to what extent the road or bridge is out of repair.   Wharton's Prec. 458, 459.

The word bridge *ex vi termini* implies that there is a stream necessary to be crossed by a bridge.   *The King* v. *Oxfordshire*, 1 B. & Ad. 289.

The caption of this information is in the form given in Wharton's Prec., and is that usually adopted for many years in this State.   In the case of *State* v. *Concord*, in 1848, the same form was used; and a demurrer was filed, raising the question whether the solicitor could file an information in vacation.   Upon a transfer to this court it was held that the information was properly filed, and no exception was taken to it in other respects.

The first count is in the usual form of the late and present attorney general Sullivan, in which no distinction is

made between the case of an old way, or one newly laid out.

The second count is a copy of that in *State* v. *Concord*, which was the case of a way including two bridges across the branches of the Contoocook river, at its mouth, and which, as before said, was not excepted to.

The third count follows the language of Wharton's Prec. and Wharton states that it is not necessary to state the particulars in which a highway is out of repair.

The words *unreasonably neglected*, &c., were not used in the case *State* v. *Concord*, and seem unnecessary. Chitty says *unlawfully* is not necessary, if the act charged is manifestly against law, and the same was held in *State* v. *Williams*, 3 Foster's Rep. 321.

*James Bell*, in reply.

It is contended that the same form of information may be used in all cases of neglect of highways, no matter what the offence is. We think the article of the Bill of Rights means something. An indictment must be capable of being used as a defence against a second prosecution.

The rule of construction which carries boundaries by a river to the centre may be controlled by quantity or measurement, or by any circumstance indicating a different intention. A rule of so flexible a character is not so important that it needs be set up against a legislative construction. We think we have shown that the legislature have treated the large rivers as different. No case has been referred to where it has been held that towns upon these large streams are bounded by the centre of the river, and the hardship of so holding is apparent in the case of small towns asked to build expensive bridges.

The form relied on by the counsel, if good elsewhere, is not good here. There is no court here that can receive a complaint except in term, and the court here is not described.

It is said where a town is liable of common right, it is not necessary to allege the ground of its liability. If it is not bound of common right, the facts which impose the liability must be alleged. The concession is enough, the indictment should show the jurisdiction to lay out the road, the petition and action of the road commissioners.

The first and second counts are defective in not alluding to any bridge. Neglect to repair roads and bridges are essentially distinct offences. The same indictment cannot be good for both at common law, and by the constitution we are entitled to be informed which was intended. Here we are not charged with any offence relating to the bridge.

The statute description of the offence must be followed; where *unnecessarily* is used, that must be alleged; so *wilfully and maliciously. Rex* v. *Davis*, Leach, 536.

BELL, J. As to the question relative to the west boundary of Canterbury and the east boundary of Boscawen, the point is whether those towns extend to the centre of the river or only to the banks. It is not understood to be contested that the general principle is, that in the construction of deeds, lands bounded by a river or stream not navigable, extend to the centre of the river; 2 N. H. Rep. 369; 9 N. H. Rep. 461; 11 N. H. Rep. 530; nor that the construction is still the same, if land is described as bounding at a stake or tree upon the bank, thence up or down, or on, or by the river to another bound upon the bank; 11 N. H. Rep. 530; 14 Mass. Rep. 149; see 13 N. H. Rep. 581; nor that the description of the line of Canterbury at the place in question, " beginning at the easterly side of Merrimack river," at a point indicated, thence by other courses round " to Merrimack river, thence down the river to the place begun at," or the description of Boscawen line, " beginning at the southerly side of Contoocook river's mouth, where the same falls into Merrimack river," thence by other courses round " to the Merrimack river to a heap of stones, and

thence by the river as it runs to the mouth of Contoocook river again, where it begun," would not be sufficient in an ordinary deed of conveyance to carry the boundary to the centre line of the river. Neither do we understand that any question is designed to be raised as to the soundness of the decision in the case of *Plymouth* v. *Holderness*, cited by the State, where it was held that the line between those towns was the centre of the Pemigewasset river, and that the centre of the river was midway between the banks; nor the case of *State* v. *Gilmanton*, 14 N. H. Rep. 467; where it was held that the towns bounded on the river Winnepissaukee are bounded by the centre of that river; nor that the principles of those decisions do not equally apply to all rivers of that class.

The point is that the great rivers Connecticut and Merrimack stand on different ground from their tributaries; and it is urged that the lines of towns could not have been intended to extend to the centre of those rivers, because many of the towns bordering on them were small, and of too limited means to support bridges across them; that the history of the State shows no such public bridges to have been built, and that the public relied on ferries and toll bridges for the purpose of crossing them; that there would be difficulty in building such bridges in concert between the towns on opposite sides of the river, without which they could hardly be built; that the construction of such grants may be controlled by circumstances; and that the court will not extend the construction, adopted in conveyances of land, to grants of municipal corporations, if it would be attended with injustice, or evident public mischiefs.

We have carefully considered these suggestions, and while we perceive their force, as considerations to be weighed, when the propriety of laying out public ways across these large rivers, and imposing the burden of building and supporting bridges upon towns of limited means, may be under consideration, they do not seem to us to furnish satisfactory grounds for departing from the ordinary rules of construc-

tion in grants.   The country is progressive and undergoing great changes as to the ability of towns to maintain bridges. In the early settlements it was burdensome to maintain bridges over streams now thought inconsiderable.   The rivers, which for a long time seemed incapable of being bridged, have not only been bridged by private enterprise, but the towns have, step by step, been found able to maintain free bridges, and the burden has been imposed upon them.   It is understood that four or five free bridges are now supported across the Merrimack by towns, and we think it now too late to say, what, perhaps, might have been plausibly said at an earlier day, that it could not be reasonably presumed that towns extended to the centre of this river, because if they did, they might be subjected to burdens beyond their strength.

We are unable to perceive that there could be any greater difficulty in two towns bounding on the centre of large streams building their respective parts of the bridges across them, than there would be in their bridging smaller streams, which has generally been effected without serious difficulty. And in England, if a part of a bridge is within one county, and the other part in another county, each county shall repair that part of the bridge which is within it.   Arch. Cr. Pl. 375 ; 3 Chitt. Cr. Law, 595.   If a difficulty should arise from this cause, it would seem to call for legislation as to the mode of building, rather than for a change of the law imposing the liability.

The legislature have, as is suggested, entire control of the limits of towns.   Their acts for this purpose require no assent or acceptance by the towns to give them force.   Any change in those limits is binding at once.   *Dartmouth College* v. *Woodward*, 1 N. H. Rep. 111 ; *Bristol* v. *New Chester*, 2 N. H. Rep. 532.

But the legislature can hardly change the effect of an existing enactment or grant, by giving legislative definitions or constructions.   Regarded as prospective, such enactments

may govern for the future the legislation to which they apply, but they cannot operate retrospectively to change the force or construction of statutes already passed, as to any right or interest already vested under them; though we can recal instances where this seems to have been attempted. The past legislation of the State may be consulted to find the meaning of doubtful expressions, upon the principle that where particular terms or phrases are used or understood in one sense in a particular business, or with reference to a particular subject, it is reasonable to suppose them to continue to be used in that sense. Probably great weight could not be given to legislative usage, if it appeared that it was entirely of a later date than the grants now in question. The charter of Canterbury bears date in 1727, that of Boscawen in 1760, and the additional grant to Canterbury in 1765. The earliest grant upon the Connecticut above Charlestown was in 1761.

The cases upon the Connecticut river differ essentially from those upon the Merrimack in this respect. They were granted when the Province of New Hampshire was regarded by the authorities who made the grants, as embracing the territory now constituting the State of Vermont. Both sides of the Connecticut were granted at about the same time. By a subsequent decision of the sovereign in England, New Hampshire was limited to the west bank of the Connecticut. That part of the towns granted by New Hampshire on the west of the river, which was east of the west bank, if any, was severed, and remained in New Hampshire. That part of the river which was west of the centre was not in any town in New Hampshire, and it became necessary to annex it to the adjoining towns. Acts, therefore, annexing islands in the river to the New Hampshire towns do not necessarily prove anything, as to the line of those towns, unless it appears that the islands were east of the centre of the river. We are not aware that this appears in any case. Probably, if there are any cases appa-

rently of that kind, they may have been cases of serious doubt as to the location of the centre line, as we suppose to be the fact in the only case referred to upon the Merrimack.

The case of the islands at the Amoskeag Falls, upon the Merrimack, formerly between Manchester and Goffstown, was one where upon the ordinary rules of construction applicable to deeds, the line between the towns was the centre of the river. The islands were of little value, and no question was made as to their being in one town or the other, until valuable mills were erected on one of them. A controversy then arose between the towns, each claiming that the centre of the river was nearest to the opposite shore, thus leaving the islands in their town. The centre of the river was then understood to be in the main channel. As it happened, the deepest channel and the most water at the head of the falls passed on the east or Manchester side. On the west side the fall was much more rapid, the water on that side running, after a short distance, at a much lower level than that on the east side. From the east channel there branched off, one after another, smaller channels, running between the islands to the west or lowest channel. None of these were very large, but collectively, they carried off so much water that at the foot of the falls the east channel carried much the less water of the two. In this state of uncertainty as to the legal centre of the river, both parties applied to the legislature, and that body, after sending a committee to examine, who reported that the main channel ran east of the islands, passed an act annexing the islands to Goffstown. Probably the convenience of the manufacturing company, which claimed the islands, and owned the mill upon them, and whose chief property and principal establishment was in Goffstown, had more weight in the decision than the legal construction of the charters of the two towns.

From casual observation in passing along the Connecticut, it seems probable that similar difficulties, in determin-

ing the centre of the river, existed as to some of the islands in that river.

Some of the acts cited, relating to towns upon the Connecticut, recite that those towns are bounded on the east bank of the river. Act of 1795; Stat. Ed. 1815, p. 247. Plainfield charter, and others. Others, by other expressions, strongly imply the same idea. These acts justify the impression that the legislature did not consider the charters of these towns to include any part of the river; yet as the acts were in most cases equally necessary, if the line extended to the centre of the river, and the recitals and preambles of acts of a local character are truly the statements of the movers of such acts, rather then of the legislature, and as such recitals have more the air of a mistake of the fact, than of an intention to change the general rule of construction, we think little reliance can be placed upon any inference from such recital, without some proof that the question was discussed and considered, which is by no means probable. We are, therefore, not inclined to draw the same inference from these cases as the counsel for the defendants, and we find no sufficient ground to doubt the propriety of applying the ordinary rules of construction to all our unnavigable rivers.

We think there is much force in the suggestion of the counsel for the State, that the grants of towns to the proprietors, which are merely grants of land, would, of course, follow the ordinary rules of construction; and it could hardly be reasonable to apply a different rule, when the same land is incorporated into a town by a description entirely identical.

It is urged that the laying out is void, because the road commissioners have no power to lay out a highway over an existing highway, and they could not, therefore, lay out such way over an existing bridge. This question depends entirely on the language of the statutes, from which these officers derive their powers. Neither selectmen of towns nor road commissioners have any authority, except such as is

conferred upon them by statute. It is admitted, that select-
men have power to lay out new highways over such ways
and bridges. The power is given them by the Revised
Statutes, ch. 49, §§ 9, 10; (Com. Stat. 135.) " Upon any
petition for a new highway, they, (the selectmen, may lay
out the same over or across any existing highway." § 9.
" Any real estate, franchise or easement of any corporation,
may be taken for a highway, in the same manner as the real
estate of individuals."

The powers of the road commissioners are given, as to
this point, by section 3 of chapter 51 of the Revised Stat-
utes, (Com. Stat. 139.) " They (the road commissioners)
shall make examination, and hear all parties interested, in
the same manner as selectmen are required to do, and *shall
have like powers.*"

If no such provision existed, there would be strong reason
to infer the existence of this power in the road commission-
ers, from the nature of the powers given them upon peti-
tions to the court of common pleas, based upon the refusal
of the selectmen to lay out new roads. These powers are
in their nature appellate, and it would seem both unnatural
and unreasonable, to suppose that the appellate tribunal
should not have full power to act in any case where an ap-
peal is allowed, to the full extent that the inferior tribunal
possessed it. The language of the statute just quoted, is
too explicit to require any resort to inference. The road
commissioners must have power to lay out highways over
existing roads, and for that purpose to take the franchises of
corporations, or their powers are, in a most essential respect,
inferior to those of selectmen. The statutes on this subject
have been acted upon for many years, and the uniform prac-
tice supports the construction we give to them.

It is said that there is no provision authorizing damages
to be awarded to the owners of bridges; but we think the
language of the Revised Statutes affords a sufficient answer
to this suggestion. " Such selectmen shall assess the dam-

ages sustained by each owner of the land, and insert the same in their return." Ch. 49, § 13, (Com. Stat. 136.) " The road commissioners shall assess the damages sustained by owners of land, as selectmen are required to do." Ch. 51, § 7, (Com. Stat. 140.) " Any real estate, franchise or easement of any corporation, may be taken for a highway, in the same manner as the real estate of individuals." Ch. 49, § 11, (Com. Stat. 136.) " If the person to whom any damages should be awarded is unknown, a particular description of the land, real estate or franchise, taken for any highway, shall be inserted in the return of the selectmen," &c. Ch. 49, § 14, (Com. Stat. 136.) The intention of these statutes appears to us to have been to give similar powers, and to impose like duties upon the road commissioners to those of selectmen, both in regard to the laying out of highways, and the award of damages. So we think it has always been regarded by the courts, in the cases where franchises of bridges and turnpikes have been heretofore taken. A grant of *like powers*, necessarily implies that those powers shall be subject to the same duties and conditions. So that where the selectmen have power to take franchises, &c., and are required to assess damages to the owner, the commissioners have the same power to take such franchises, but subject to the same duty of awarding damages.

It is further objected, that the road commissioners have made a single award for the whole right of the bridge owners, and have made no separate award of damages in each town, as they are required to do by section 7 of chapter 51 ; neither have they said that the damages were equal in the two towns. The award is " the sum of five dollars, to be equally paid by the said towns." Though the report does not formally state the damages in each town, yet we think it is sufficiently apparent that the damages awarded in each town were one half of five dollars.

These objections to the proceedings of the road commis-

sioners are met by the suggestion that the record is conclusive, and not liable to be thus collaterally and incidentally impeached. If it is defective, it should be quashed upon a *certiorari.* The answer to this is, that the case of the bridge company is not that of land owners, who can come in within a year, (ch. 50, § 10,) and have their damages assessed; they are without remedy, except by holding the laying out void. Upon the clauses of the Revised Statutes before quoted, we think this answer is at least open to doubt, but however that may be, the town was a party to these proceedings; they have always had the right to apply to the court for a *certiorari,* for the cause of any defect in the laying out, which may operate injuriously to them, and if the laying out is void as to any land owner, so that the town cannot build the road without trespassing, it was a good cause to quash the proceedings, to them as well as to the owner. Until that is done, the laying out cannot be treated as a nullity by the town, unless the defect is one which strikes at the jurisdiction of the court, by which the road is laid. See *State* v. *Richmond,* 6 Foster's Rep. 232.

Of the same class of objections is that which asserts that if the commissioners had the power to lay out a public way over a toll bridge, subject to the obligation to award damages to the owners of the franchise, they have here made no such award. Their only award is " for their easement interest and franchise *in and to the land,* &c." It is said, a franchise of erecting a toll bridge and taking tolls of passengers, is not a franchise *in and to land.* It is not real estate. It is a right or privilege existing in contemplation of law, and which may exist without connection with any real estate; as must be the case with turnpike and bridge franchises, until the actual location of the road or bridge.

It is obvious that this is merely a question of construction of the language used by the commissioners. No one can doubt that the intention was to award damages to the bridge owners for the loss of their franchise of a toll bridge

at that place, where their bridge had been previously located. They use the words *in and to the land,* where they mean in and upon or over the land. The word *to* seems wholly inapplicable, and out of place, but *in,* though perhaps not the best, seems definite enough to show that the damages were awarded for an interest, easement and franchise in that place.

A further objection is made to the laying out in this case, founded on facts proposed to be shown upon the trial, and the evidence of which was held inadmissible by the court. This is, that no authority is given to the commissioners to lay out bridges. They are authorized to lay out highways. Such highways may be laid out across any river or stream, except navigable or tide waters. Ch. 49, § 10. Highways, as used in the Revised Statutes, " *include all bridges thereon,*" and no others; consequently no bridge can be laid out, unless it is part of a public highway. Indeed the objection, in its principle, goes further, that no highway can be laid out, unless it is connected with some other highway, by which those who make it, and those who are to use it, can get to it without trespassing.

On the trial, the defendants offered to prove that there was no highway leading to or from this bridge. The ways used to the bridge, as it was formerly used, were private ways of the bridge company, which cannot become public highways, except by being laid out agreeably to the statutes. Rev. Stat. ch. 54, § 7, (Com. Stat. 144.) If this point of law is well taken, the evidence was erroneously rejected. Upon the laying out of a highway, it strikes us there is a substantial foundation for an exception of this kind. A highway cannot be properly laid out unless it is connected with other highways, or unless it is of such extent that it may be useful as a public highway to persons resident upon it. If laid out where it cannot be reached by the public travel without trespass, it would be a capital objection to the laying out. But as to this point the objection

before stated applies, that the proceedings of the court in laying out a highway, however erroneous, cannot be treated as void in a collateral proceeding like the present. They may be quashed upon a *certiorari*, but while they remain unreversed they are binding upon all who were parties to them. The question whether this new highway including the bridge was rightfully laid out, was the principal point decided by the court of common pleas, and it therefore was not open to be questioned upon this indictment, as affecting the validity of the proceedings.

Facts, affecting the jurisdiction of a court, remain always open to inquiry, but it is otherwise with those which affect only the regularity or legality of its judgments.

There is, however, another view in which the evidence that the bridge was not connected with any highway, was material and proper to be received. If the public had no way by which they could use this new bridge and the few feet of other highway connected with it, and its extent was not sufficient to make it useful to those who dwelt upon it, it could not be a nuisance not to keep it in repair. As the public may have other rights of access to a bridge than those of a public highway, as, for example, the town may own the land used for a way, or an easement upon it, to pass over the bridge, or the way may have been opened for public use by individuals, so that a general license exists to use it, evidence that there is no public highway is not conclusive; but the evidence should have been received and submitted to the jury, whose duty it would be to consider whether a town could be found guilty of a nuisance, without some proof that the neglect of the town has been to the public injury.

The defendants take exception because the court refused to rule that the prosecutor should elect upon which count of the indictment he would proceed. We think the rule of the law, on this subject, is well stated by Archbold, (Crim. Pl. 31,) " though a prosecutor cannot charge a defendant with

different felonies in different counts, yet he may charge the same felony, in different ways, in several counts, in order to meet the facts in the case." 2 B. & P. 508. Indictments for misdemeanors may contain several offences, provided the judgment upon each will be the same. 2 D. & E. 96, 106; 3 East 46; 2 Burr. 984. In *State* v. *Fly*, 26 Maine Rep. (13 Shepl.) 312, *Tenny*, J., says: "It is usual to charge a felony in different ways, in several counts, with a view to meet the evidence, as it may turn out on the trial, and if the different counts are inserted in good faith, for the purpose of meeting a single charge, the court will not ever compel the prosecutor to elect." The same rule is laid down in *Kane* v. *The People*, 8 Wend. 211, and 1 Chitty's Crim. Law 204. As the number of counts here is not so great as to occasion any embarrassment to the defendants, we think this exception must be overruled.

As to the motion in arrest, because there is a general verdict of guilty on all the counts, while one or more of the counts is bad, the rule is thus laid down by Chitty, (2 Crim. Law 249,) " Nor will the defects of some of the counts affect the validity of the remainder, for judgment may be given against the defendant upon those which are valid." The same principle was held in *People* v. *Olcott*, 2 John. Cases 311; 3 U. S. Dig. 533, Indt. IV, 353, 355, 358, 359; 5 U. S. Dig. 157, Indt. VII, 326; U. S. Dig. 1847, Indt. V. 72.

Several objections are connected with the manner of charging the offence in the several counts of the indictment. Every count is alleged to be bad, and, it is contended, that neither of them is supported by the evidence.

The liability of towns to support highways and bridges, and to be indicted for neglect, now rests substantially on our statutes; though there is a close resemblance of their duties and liabilities to those of parishes in England as to roads, and of counties as to bridges. The existing statute on this subject is chapter 53 of the Revised Statutes. So far as it applies to this case, it is as follows :

" Fines shall be imposed upon towns for neglect to make or repair highways in the following cases :

1.   If any town shall unreasonably neglect to make and put in good repair any new highway laid out therein.

5.   If any town shall neglect to keep any highway therein in good repair, and suitable for the travel passing thereon."

Bridges are not referred to, by that designation, in any part of the title of the Revised Statutes relating to highways, an omission which could hardly be accidental or designed to exonerate towns from liability to fines, for neglect to build or repair the bridges in their limits.   The explanation is found in the definition of the word *highway*, in the first chapter of the Revised Statutes, section 21.   " The word *highway* or road shall include all bridges thereon."   So that the first case will read, in effect, if any town shall unreasonably· neglect to make and put in good repair any new highway laid out therein, or any bridge in such new highway ; and so of the other case, so that towns here are liable, like parishes in England, for defects of highways, and like counties there, for defects of bridges in highways.   A small number of definitions were introduced in the Revised Statutes for the sake of brevity, and to prevent the recurrence of several terms, which, by a forced construction, might be included in a single word ; but such definitions can, in the nature of things, have no effect, except in the construction of the statutes themselves.   The meaning of language depends on popular usage, which is not and cannot, unless in a very slight degree, be affected by legislation.   While, then, the construction of the statutes is governed by legislative definitions, that of indictments is governed entirely by the ordinary use of language. ·

By the constitution, " no citizen shall be held to answer for any crime or offence, until the same is fully and plainly, substantially and formally described to him."   And it is, therefore, indispensable that an offence should be described

in the appropriate language, according to the ordinary and correct usage, as it existed before the Revised Statutes.

With these principles before us, we may examine the counts of this information, and consider their sufficiency.

The first count alleges that on, &c., there was, and ever since has been and still is, a new public highway in C. and B., duly laid out and established as follows : beginning, &c., over and across said bridge, &c., two hundred and twenty-two feet to the centre of Merrimack river, &c., to B.; that the part of said highway in C., two hundred and fifty-eight feet long and four rods wide, was on said, &c., ever since has been and still is, *rocky, hilly, broken, uneven, unfinished,* and in want of making thereof, so that the citizens, &c., could not and cannot pass and repass, &c., and said C. was bound to make and repair, &c.; yet did unreasonably neglect and refuse to make and put in good repair the said part, &c., to the great damage and common nuisance, &c., and against, &c.

Upon its face, this seems to be a good count for neglect to make and repair a highway. It alleges everything required at common law or by statute, to charge the town in such a case. Upon the motion in arrest of judgment, it is, therefore, sufficient. But there is an exception taken, which raises the question whether, upon this charge, a conviction can be sustained upon the evidence. The charge is that a new highway is rocky, hilly, broken, uneven, unfinished, and in want of due making. The evidence is that the new highway is laid across a river, impassable without a bridge, and that the town have unreasonably neglected to build the requisite bridge. Unless, then, at common law, or by the ordinary use of speech, the charge that a new highway is not made, includes the charge that a new bridge is unbuilt, the allegations are not sustained by the evidence. Now it seems to us very clear that, at common law, an indictment for neglect to repair a highway cannot be sustained by proof that a bridge is out of repair. Clearly not against a

county, because counties are not liable for the support of highways, except for such as constitute the approaches of bridges for three hundred feet on each side of the river. And for these they are chargeable as parts of the bridge. And we think it clear that the charge must be for neglect to repair a bridge in terms. So are all the forms in the books to which we have access. 2 Chitty's Crim. Law 593 (360) &c., to 603 (369); Cr. Cir. As. 244; Arch. Cr. Pl. 375; 4 Went. Pl. 178, 187; 1 Burns' Just. 273.

And unless a special ground of liability were set forth in it, such an indictment against a county could not be sustained upon any evidence. Wool. on Ways 76, &c.

An indictment against a parish for neglect to repair a highway, could not be supported by proof of neglect to repair a bridge, because of common right the duty to repair bridges rests upon the county, and the parish is never chargeable, unless a special ground is set forth in the indictment, which implies that the charge must be for not repairing a bridge. They are of common right liable for not repairing highways, and, of course, no special ground of liability should be alleged where the charge relates to highways. Woolrich on Ways 238, 227; 2 Chitty's Crim. Law (355) 589.

At common law, then, a neglect to repair a bridge is not included under a general charge of not repairing a highway. 2 Chitty's Crim. Law 592 (358); 1 Burns' Just. 269.

At common law, no indictment was maintainable for not building new bridges. Bridges seem to have been built, in England, either by the liberality of individuals, or under the authority of special acts of Parliament. Wool. on Ways 963. And no trace has been found of any indictment for neglect to build a new bridge by such description, and there would be no pretence that such an offence would be there described, by alleging a neglect to repair or build a new highway.

According to the common use of language, there is a

sense in which a bridge may be spoken of as a highway, but the word highway does not import a bridge; and, in any case, where there is occasion to notice any of the differences which exist between highways generally and bridges, it is indispensable that the difference should be marked by the use of the terms appropriated to each. The Revised Statutes have made no difference in the rules in this respect. Indictments must be construed by the ordinary rules of the language, and not by these artificial rules. By those ordinary rules, the words highway and bridge are not equivalent or convertible, and if a party is to be charged with neglect to build or repair a bridge, it must be by the term bridge, which alone describes such a structure.

To charge a party with neglect to make or repair a highway, according to the natural and usual meaning of words, is not to charge neglect of building and repairing a bridge, but it is essentially a different thing. So far from fully and plainly describing the offence, it describes a very different matter. So that neither at common law nor under our statute, nor by usage, is it sufficient to allege the offence intended by the evidence in the terms of this count.

The second count alleges the laying out of a new road, describing it, and an order on the town to build their part, on or before a certain time, as appears by the record, &c. Yet the town did refuse and neglect to build and complete, &c., contrary, &c.

This count omits any allegation that the road was bad, or needed making, or was not passable, and omits to the common nuisance, &c. Unless, then, it is to be assumed that new roads, every where, and of course, want making, these allegations should have been inserted, or something should be alleged from which the necessity may distinctly appear. And we think it does not so appear in this case. The laying out is across the Merrimack, but it is not alleged that there is no bridge; on the contrary, it might be inferred fairly that there was a " bridge standing "

there. Highways may well be laid out, where parties de-
siring it have already built both highways and bridges; and,
in some of our larger towns, no new streets are ordinarily
laid out until they have been made and put in complete
repair. Neglect of making the highway or building the
bridge is not, therefore, sufficiently alleged, unless the occa-
sion for the repairs or the necessity of a bridge is distinctly
alleged.

The third count alleges a public bridge across Merrimack
river, in C. and B., in the public highway from, &c., to &c.,
for horses, carriages, &c., and that on, &c., it was unmade,
ruinous, broken, dangerous, &c., and that C. is bound to
repair, &c., to the great damage and nuisance, &c., contrary,
&c., and against, &c.

Though perhaps deficient in the arrangement of its sen-
tences, this count states a good cause of prosecution for
neglect to repair an existing bridge. It is, therefore, open
to no objection on the motion in arrest. But upon the ex-
ception as to the proof, we think, it was not sustained
by the evidence. There is no pretence that there was a
bridge there in a ruinous state. The true ground of com-
plaint was, not that a public bridge there was out of repair,
or unsafe, but that there was no bridge; there never had
been any at or after the laying out. The count should have
stated that there was a highway across a river, that a bridge
was required for the convenience and safety of travellers,
that C. was bound to build such highway and bridge, and
had neglected to do it. Such a count would have agreed
with the proof.

To conform to the evidence stated in the case, a count,
after stating the laying out of a new highway, &c., might
allege that the M. river, across which, &c., is a wide and
deep river, with high and steep banks, (if so,) and entirely
impassable, either on foot or with horses,.&c., so that the
citizens, &c., for want of a bridge, &c., could not from, &c.,
until, &c., go, pass, &c., without great danger, &c., by means

whereof it became, &c., necessary, in order that the citizens, &c., having occasion to pass, &c., might go, pass, &c., in safety, that a good, &c. bridge should be there erected, &c., across, &c.; of all which said C. had notice, and it then and there became, &c. the duty of said C. to make and put in good repair said new highway, and in order thereto to build such bridge from, &c. to &c., and to make a road, &c. from thence ———— feet to the stake aforesaid; yet said C., knowing, &c., but neglecting, &c., did then and there unreasonably neglect, and have ever since neglected, to make and put in good repair said new highway, by building, &c. such bridge, to the great, &c., contrary, &c., against, &c.

The formal part of the information is not in the usual form, as we find it in the books, though it appears to be drawn agreeably to precedents in this county. An information is the suit of the sovereign, and is usually filed in his name, and it usually purports to be filed in open court during a term.

These, however, are matters of form, not traversable, and may probably be amended on motion.

*New trial granted.*