Rockingham,
No. 6038.

TOWN OF RYE

*v.*

JACOB S. CIBOROWSKI

THOMAS J. MORRIS, INTERVENOR

April 5, 1971.

*Boynton, Waldron & Dill ( Mr. Richard E. Dill orally ), for the plaintiff.*

*William Maynard, Vincent P. Dunn, and Grinnell & Bureau ( Mr. George H. Grinnell orally ), for the defendant.*

*McLane, Carleton, Graf, Greene & Brown ( Mr. Stanley M. Brown orally ) for the intervenor.*

*Grinnell & Bureau ( Mr. George H. Grinnell orally ), for the Aviation Association of New Hampshire.*

PER CURIAM. The town of Rye, which had granted defendant a variance or a special ruling to "establish a private landing area" in front of his home partly in a business area and part-

ly in a single residence area, seeks by bill in equity to restrain defendant from what it claims is an extension to the detriment of the town of the use permitted by the variance.

The matter was heard before *Amos N. Blandin, Jr.*, Judicial Referee, who took a view and who permitted Morris to intervene over objection. He denied subject to exception the request of the Aviation Association of New Hampshire to intervene.

In April 1964, the defendant petitioned the Rye Zoning Board of Adjustment by letter for permission to "establish a private landing area of approximately 1800 feet in length in front of my home on Lafayette Road . . . ." A petition on a form provided for requesting a variance was also filed.

The Rye zoning ordinance does not permit use for aviation in any zone but contains a section (Section 9-F) entitled "Special Rulings" as follows: "Any building or premises may be erected, altered and used in any district for any of the following purposes provided the Board of Adjustment shall rule that such use is not detrimental or injurious to the neighborhood." The first use listed is "Aviation."

Four abutters, including the intervenor, signed separate but almost identical statements prepared by the defendant stating that, with reference to his application for variance "for a private airport," they had no objection. At the hearing no objection was raised, and a motion that "the variance be granted" was carried with all in favor on May 26, 1964. The Clerk of the Board testified that the variance was granted on the basis of representations by the defendant that he was constructing a runway of 1800 feet for his own personal use only.

Defendant applied for site approval from the New Hampshire Aeronautics Commission (N.H.A.C.) and for "air space" from the Federal Aviation Authority (F.A.A.) representing that he proposed a 1700' x 200' sod runway for limited private use and that the anticipated use five years later would be for two based aircraft with a maximum of fifteen landings per month. He was granted "air space" over objections of the Pease Air Force Base on May 18, 1965. Upon filing a sketch with the N.H.A.C. showing a 1700' x 200' turf runway, he was advised on March 14, 1966 that to get site approval he would need to clear the area at each end to allow clearance for landings and that some of the required clearing might be on land of others so that necessary easements would have to be obtained. "Site approval" was given on April 18, 1966.

In the process of complying with this requirement, defendant purchased land easterly of his runway, including a parcel from the intervenor Morris. Defendant and Morris had some dispute over rights in certain of the land resulting in a pending action which is not material to the issues before us. By October 1966 a runway 2600' x 200' was partly completed and was wholly completed and macadamized by June 1968 and opened for public use.

The Cibor Airstrip, as it is called, is adjoined by Lafayette Road on the west and by a cleared area of about 1700 feet on the east before reaching Moodyville, a development of about twenty-nine houses with about 127 persons. The west end of Cibor Airstrip is about four miles from the easterly end of the main Pease Air Base runway. Cibor is less than one and one-half miles southerly of the extended line of the Pease runway and is inside the Pease traffic patterns.

The judicial referee found on sufficient evidence that in the summer of 1968 the number of planes using Cibor had increased to a "dozen or more" with fifteen-twenty landings a day sometimes with numerous flights over Moodyville at tree-level height which greatly alarmed inhabitants; that there had been a number of night takeoffs from the unlighted strip; that complaints had been made to state and federal authorities with no effective action resulting; that there have been numerous low-level flights over the Morris land which are hazardous to persons and cattle and which create a private nuisance. He also found that the zoning board granted the variance relying on defendant's representation that "he would have an 1800 foot runway for (his) own personal use and would not generate any traffic other than that." He also found that the assents of Morris and one Ham were obtained on similar representations and would not have been obtained otherwise, that these representations were "not deliberately fraudulent" but that defendant changed his plans after getting started and "has established and is conducting a greatly expanded and hazardous operation" which the board had not permitted. He found that the defendant in expending substantial sums on the airstrip either knew or should have known that he had no right to do as he has and that any hardship on him is self-inflicted.

In October 1967, defendant had applied to the N.H.A.C. for approval of a private, commercial airport but on January 8, 1968 withdrew his request because of objections.

The judicial referee recommended a decree in ten parts that was approved by the Court ( *Keller*, J. ) on March 10, 1969, which limited the use of Cibor to defendant's own single-engine plane and one other single-engine plane, prohibited night use while unlighted, limited use to fifteen takeoffs and landings per month, prohibited · multiple-engine or jet aircraft, student pilot training, touch-and-go landing practice, or aerial acrobatics, required aircraft to clear structures and trees in Moodyville by 100 feet, limited use at the westerly end to that ordered by N. H.A.C., ordered defendant to use all reasonable efforts to prevent unauthorized use, and made defendant responsible for posting notice and fulfillment of all F.A.A. and N.H.A.C. safety and operations regulations. Questions raised by the exceptions of defendant and the Aviation Association of New Hampshire were transferred by *Grant*, J.

Defendant contends that the term "private landing area" as used in his application and by him in the forms signed by the abutters must be construed in accordance with the definition contained in RSA 422:3 ( XXV ) ( the Aeronautics Act ) as "any landing area other than a public landing area" which is defined in paragraph XXVII as one "owned, occupied, or leased by the federal government, the state, counties or towns." He maintains, therefore, that the term refers to ownership and not use and since there are no limitations or conditions attached to the permit, he is under no restrictions on use so far as the town is concerned.

RSA 422:3 ( XVII ) describes a "commercial landing area" as one used "to render an aeronautical service for compensation . . . ." RSA ch. 424, which relates to airport zoning, in section 4 places certain "privately owned airports" which have been licensed for commercial operation in the same position as publicly-owned airports for the purpose of zoning under that chapter. The zoning authorized by this chapter relates to control of structures so as not to interfere with airport approaches. This chapter refers to "privately owned" and "publicly owned" airports rather than merely "private" and "public" as in RSA ch. 422.

There was nothing in defendant's application or in the consent forms which indicated that he was using the term "private landing area" and "private airport" as defined by any statute. Although legislative definitions have weight in construing the

particular statutes in which they appear, when the words are used elsewhere their meaning depends on popular usage and the circumstances surrounding their use, unaffected by statutory definitions. *State* v. *Adams,* 51 N.H. 568 ( 1872 ); *State* v. *Canterbury,* 28 N.H. 195, 228 ( 1854 ).

The findings of the judicial referee that the " variance " or " special ruling " for the operation of a private landing area or airport referred to private use and not ownership was justified under all the circumstances. The defendant's own testimony and his application for a noncommercial license show that a private use was what he originally intended. In fact, in his testimony when asked if the other airport owned by him was a private airport, he replied " No, it's commercial. " The judicial referee's conclusion that the variance approved was for defendant's own personal use only was warranted. His finding that the use being made of the airport by defendant was beyond the scope of the use granted was also supported by the evidence. *See New London* v. *Leskiewicz,* 110 N.H. 462, 272 A.2d 856 ( 1970 ).

Defendant contends that what he did, he did openly and that the town and the intervenor had four years in which to object. This relates to the physical layout and construction of the airstrip. The type of construction and the added length would not charge anyone with knowledge that defendant intended to exceed the permitted use. Nor was an article in a magazine regarding his intentions constructive notice thereof.

It does not appear that the increased length of the runway in itself would contribute any increased danger to the community or is injurious or detrimental to it, and the decree does not require any change in it.

The restrictions contained in the decree are supported by the evidence with the exception of the prohibition of multiple-engine and jet aircraft. Since the order by its terms is subject to modification by the court, the restriction on the type of aircraft can be subject to reconsideration if this appears to be material to defendant.

Defendant excepted to the exclusion of evidence relative to the proximity of other airports to one another and to their safety relative to Cibor. Some of this type of evidence was introduced and it was entirely within the judicial referee's discretion to exclude more of it on objection. The issue being tried was not the

relative safety of Cibor but whether the use complained of exceeded that allowed by the variance.

Defendant's exception to the introduction of the deposition of the intervenor is overruled. It was taken by agreement in this action because the intervenor was not expected to be and in fact was not available at the time of trial. RSA 517:1 and 11; *cf. Cote* v. *Company*, 86 N.H. 238, 241, 166 A. 279, 281 ( 1933 ).

The judicial referee's denial of defendant's request that he witness a demonstration of a plane taking off and landing at Cibor was a matter which was within his discretion. *State* v. *Langelier*, 95 N.H. 97, 58 A.2d 315 ( 1948 ); *Meyer* v. *Short*, 104 N.H. 328, 186 A.2d 146 ( 1962 ).

The exception of the Aviation Association of New Hampshire to the denial of its motion to intervene is overruled. The issue before the court was not concerning the desirability of an airport from the standpoint of aviation, but whether the use being made and contemplated exceeded that permitted by the variance. *New London* v. *Leskiewicz supra.* The denial of the motion was within the discretion of the trial court ( *Scamman* v. *Sondheim*, 97 N.H. 280, 86 A.2d 329 ( 1952 )) and under all the circumstances we find no abuse of that discretion.

We have examined the balance of defendant's exceptions and contentions and find no prejudicial error.

*Exceptions overruled.*

*Griffith*, J., did not sit; the others concurred.